IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA,  )
                               )  District Court
               Plaintiff,      )  Case No.
v.                             )  15-10119
                               )
JESUS REYES,                   )  Circuit Court
                               )  Case No.
               Defendant.      )  17-3026


TRANSCRIPT OF MOTION TO SUPPRESS HEARING

     On the 2nd day of August, 2016, came on to be heard
proceedings in the above-entitled and numbered cause
before the HONORABLE ERIC F. MELGREN, Judge of the
United States District Court for the District of Kansas,
sitting in Wichita, commencing at 9:00 A.M. Proceedings
recorded by machine shorthand.  Transcript produced by
computer-aided transcription.

APPEARANCES:

The plaintiff appeared by and through:
        Ms. Michelle A. Jacobs
        United States Attorney's Office
        1200 Epic Center
        301 North Main Street
        Wichita, Kansas  67202-4812

The defendant appeared by and through:
        Mr. Mark A. Sevart
        P.O. Box 781602
        111 North Baltimore
        Wichita, Kansas 67037

I N D E X

PAGE

WITNESSES

    For the Plaintiff
    OFFICER CHRISTOPHER HORNBERGER
        Direct Examination By Ms. Jacobs          4
        Direct Examination By Ms. Jacobs          4
        Cross-Examination By Mr. Sevart          30
        Redirect Examination By Ms. Jacobs       46
        Recross-Examination By Mr. Sevart        47
    OFFICER JARED HENRY
        Direct Examination By Ms. Jacobs         48
        Cross-Examination By Mr. Sevart          69

EXHIBITS                                       ADMD
For the Plaintiff:
No. 1        Photo of rear of Saturn Vue          66
No. 2        Photo through open driver's          66
             side door
No. 3        Photo through open passenger         66
             side door
No. 4        Close-up photo of marijuana          66
             blunt


REPORTER'S CERTIFICATE                          115

8-2-16   USA v. REYES No. 15-10119

3

09:00:06   1         CLERK KUHLMAN:  All rise.  The United States

09:00:09   2    District Court for the District of Kansas is now in session,

09:00:10   3    the Honorable Eric F. Melgren presiding.

09:00:13   4         THE COURT:  Good morning.  You may be seated.

09:00:15   5         The court calls the case of the United States

09:00:23   6    versus Jesus Reyes, Case No. 15-10119-01.  The United States

09:00:30   7    appears by Assistant United States Attorney Michelle Jacobs,

09:00:32   8    and the defendant appears in person and by his counsel Mark

09:00:36   9    Sevart.

09:00:37   10        Mr. Reyes, at a point in time in which he was

09:00:41   11   representing himself, filed two motions to suppress:  a motion

09:00:44   12   to suppress statements at Docket 26 and a motion to suppress

09:00:49   13   the search based on the stop being illegal at Docket 27.

09:00:54   14   Sometime after he filed those motions, he had requested that

09:00:56   15   the court appoint counsel for him, and Mark Sevart was

09:00:59   16   appointed.  Mr. Sevart then filed a motion to suppress at

09:01:03   17   Docket 42, and it appears to me, Mr. Sevart, that really your

09:01:07   18   motion at Docket 42 pretty much covers the same issues or

09:01:12   19   topics that Mr. Reyes' motions filed at the two dockets

09:01:16   20   previously did.  Would you agree with that?

09:01:17   21        MR. SEVART:  Yes, Your Honor.  And that was

09:01:19   22   certainly my intent.

09:01:19   23        THE COURT:  All right.  Counsel, how do you

09:01:21   24   propose that we proceed here?

09:01:23   25        MS. JACOBS:  Your Honor, I have two witnesses.  I

09:01:27  1  will go ahead and start with direct examination on both of

09:01:30  2  those witnesses, if the Court would like.  I've also placed on

09:01:34  3  the judge's bench, as well as given a copy to defense counsel

09:01:38  4  and the law clerk, pictures of four exhibits.  Mr. Sevart was

09:01:41  5  okay with me going ahead and providing these to the Court.

09:01:45  6  Obviously, with my second witness, I'll establish that

09:01:48  7  foundation, but Mr. Sevart was okay with me going ahead and

09:01:50  8  giving those to the Court prior to the start of trial.

09:01:53  9          THE COURT:  Very well.  Ms. Jacobs, you may

09:01:55  10  proceed to call your witnesses.

09:01:57  11          MS. JACOBS:  Thank you, Your Honor.  The first

09:01:58  12  witness the Government would call would be Officer Christopher

09:02:08  13  Hornberger.

09:02:08  14          THE COURT:  Officer, if you'll come stand in front

09:02:10  15  of the courtroom deputy he'll swear you in, and then you may

09:02:13  16  have a seat in the witness box to my right.

09:02:13  17          OFFICER CHRISTOPHER HORNBERGER,

09:02:13  18  having been first duly sworn to testify the truth, the whole

09:02:21  19  truth, and nothing but the truth, testified as follows:

09:02:32  20          DIRECT EXAMINATION

09:02:32  21  BY MS. JACOBS:

09:02:41  22    Q.  Good morning.

09:02:42  23    **A.  Good morning.**

09:02:43  24    Q.  Would you please go ahead and state your name for the

09:02:45  25  record.

09:02:45  1    A.   Christopher Hornberger.

09:02:46  2    Q.   And are you an officer; is that correct?

09:02:49  3    A.   Yes, ma'am.

09:02:49  4    Q.   And where are you employed?

09:02:51  5    A.   The Wichita Police Department.

09:02:53  6    Q.   How long have you been employed with the Wichita Police

09:02:56  7    Department?

09:02:56  8    A.   Approximately eight and a half years.

09:02:57  9    Q.   All right.  What are your job duties as an officer with

09:03:01  10   the Wichita Police Department?

09:03:02  11   A.   I'm assigned to the Special Community Action Team.  And

09:03:08  12   at the time of this case I was on the night SCAT team, Patrol

09:03:14  13   North Bureau, and we were mainly tasked with working

09:03:16  14   neighborhood complaints.

09:03:17  15   Q.   All right.  And when you say North Team, can you tell

09:03:21  16   the Court what area of town you were working?

09:03:23  17   A.   The Patrol North area, generally north of Central on up

09:03:29  18   to the city limits.

09:03:29  19   Q.   Okay.  What does it mean to be a member of the Special

09:03:39  20   Community Action Team?

09:03:39  21   A.   We're a specialty unit that are mostly tasked with

09:03:44  22   neighborhood complaints mainly involving drugs and gangs.  And

09:03:48  23   we also are tasked with aggressively investigating violent

09:03:52  24   crimes.

09:03:52  25   Q.   Okay.  And prior to May 29th of 2015, had you received

09:04:04  1    information regarding a location at 409 West Eleventh Street?

09:04:07  2        **A.    Yes.**

09:04:08  3        Q.    Would you explain to the Court what you had learned.

09:04:11  4        **A.    Approximately a week prior from the stop, I received an**

09:04:15  5    **email, which was basically a tip, referenced to drug activity**

09:04:21  6    **going on there.  It was pretty vague in detail, but it said**

09:04:25  7    **that there -- an anonymous party had called in, stating that**

09:04:29  8    **there was possible drug sales and drug usage going on at that**

09:04:32  9    **location.**

09:04:32  10       Q.    Okay.  Were there any other information -- was there

09:04:36  11   any other information that came in from the community or

09:04:39  12   someone in the community regarding this location?

09:04:41  13       **A.    Yes.  The day before this stop, I overheard a**

09:04:47  14   **dispatch --**

09:04:47  15                MR. SEVART:  Your Honor, I'm sorry.  I'm going to

09:04:49  16   object as far as foundation and particularly hearsay.  I

09:04:54  17   understand it's a motion, but if they're trying to use that as

09:04:58  18   some sort of probable cause, and I would object.  If it's

09:05:01  19   merely just foundation as to what he's doing, his job, that may

09:05:05  20   be a different issue.

09:05:05  21                THE COURT:  I'm going to let the officer testify

09:05:08  22   as to what might be hearsay solely for the purpose of

09:05:11  23   indicating what his response actions were.  But with respect to

09:05:15  24   matters relating to this case, of course, I won't consider that

09:05:19  25   testimony to the extent it bears on the truth of the matter

09:05:23  1   asserted as it relates to these issues.  But as to explaining

09:05:26  2   his actions or responses, I will permit it.  You may proceed.

09:05:30  3                  MS. JACOBS:  Thank you.

09:05:31  4   BY MS. JACOBS:

09:05:31  5      Q.  You stated the day before you heard something over

09:05:34  6   dispatch?

09:05:35  7      **A.   Yes.  Dispatch put out a 911 call, reference to a**

09:05:39  8   **Hispanic male that was possibly involved with drug sales at**

09:05:42  9   **that same location of 409 West Eleventh Street.  As I stated, I**

09:05:46  10  **previously had the information on that.  So we disregarded the**

09:05:49  11  **patrol officers because we were going to be working that**

09:05:52  12  **complaint from our angle.**

09:05:53  13     Q.  All right.  And then did you know anything else about

09:05:56  14  this location prior to May 29th of 2015?

09:05:59  15     **A.   No.**

09:06:00  16     Q.  Had you made any other stops related to this residence?

09:06:03  17     **A.   Yes, I had.  The week before, I believe it was the**

09:06:10  18  **Thursday night before this stop, shortly after I had received**

09:06:12  19  **the initial email tip on it, I did conduct a traffic stop with**

09:06:16  20  **an individual that was leaving that location.  And through the**

09:06:19  21  **duration of that traffic stop, that individual was found in**

09:06:22  22  **possession of methamphetamine and marijuana.**

09:06:23  23     Q.  And did you actually make an arrest on that traffic

09:06:28  24  stop that night?

09:06:29  25     **A.   Yes.**

09:06:30    1      Q.   So let's go ahead and move forward to the events of

09:06:32    2   May 29th of 2015.  With reference to this location that I

09:06:37    3   previously stated, the 409 West Eleventh Street, can you tell

09:06:42    4   the Court when you first saw the residence that night or what

09:06:45    5   you did?

09:06:45    6      **A.   I believe it was a little before midnight on the 29th,**

09:06:50    7   **I was riding with Officer Henry that night and I was driving**

09:06:53    8   **our patrol vehicle.  We were pretty much on routine patrol in**

09:06:57    9   **that area, and we drove by that residence, as we drive by**

09:07:01   10   **several complaint locations that we know of.  We drove by that**

09:07:04   11   **location and we observed a white Saturn Vue parked in the**

09:07:07   12   **driveway of that residence, so we decided to conduct**

09:07:10   13   **surveillance on the residence.**

09:07:11   14      Q.   Had you seen the Saturn Vue at the residence before?

09:07:14   15      **A.   No.**

09:07:15   16      Q.   And I say that.  Have you actually driven by that

09:07:18   17   residence on a number of occasions prior to the evening of

09:07:21   18   May 29th?

09:07:21   19      **A.   Yes, I had.**

09:07:23   20      Q.   In what direction was the Saturn Vue parked?

09:07:25   21      **A.   It was parked in the driveway.  I believe it was facing**

09:07:29   22   **towards the south.**

09:07:30   23      Q.   Okay.  And so you were able to see the rear end of it;

09:07:33   24   is that a correct statement?

09:07:34   25      **A.   Yes.**

8-2-16  USA v. REYES No. 15-10119

| | | |
|---|---|---|
| 09:07:36 | 1 | Q.  Can you tell the Court whether or not that drive -- how |
| 09:07:39 | 2 | that driveway sits?  Is it a loop-around driveway?  Is there |
| 09:07:42 | 3 | only one way in and out, does it go to an alley?  If you know |
| 09:07:47 | 4 | any of that. |
| 09:07:47 | 5 | **A.  I believe it's a shared driveway because that location** |
| 09:07:50 | 6 | **is a duplex and there's also another house to the east of it,** |
| 09:07:54 | 7 | **and I believe it's a shared driveway and it was parked in** |
| 09:07:56 | 8 | **between.** |
| 09:07:57 | 9 | Q.  So the only one way to get in and out of the driveway; |
| 09:08:01 | 10 | is that an accurate statement? |
| 09:08:02 | 11 | **A.  Yes.** |
| 09:08:03 | 12 | Q.  All right.  So you decided to do surveillance.  What |
| 09:08:06 | 13 | did you do? |
| 09:08:07 | 14 | **A.  I parked our patrol vehicle to the west of that** |
| 09:08:10 | 15 | **location, a few blocks away, kind of behind another parked car** |
| 09:08:15 | 16 | **where our patrol car was kind of hidden from view to the east,** |
| 09:08:20 | 17 | **but I could clearly see if anything left the driveway of that** |
| 09:08:24 | 18 | **location.** |
| 09:08:24 | 19 | Q.  Okay.  Did you have visual contact with that driveway |
| 09:08:30 | 20 | the entire time? |
| 09:08:31 | 21 | **A.  Yes.** |
| 09:08:36 | 22 | Q.  What occurred next? |
| 09:08:39 | 23 | **A.  We sat off for a short time, and the vehicle did back** |
| 09:08:42 | 24 | **out of the driveway and it came westbound actually towards us** |
| 09:08:46 | 25 | **on Eleventh Street.** |

09:08:47  1    Q.  Okay.  Did it drive by you?

09:08:50  2    A.  Yes.

09:08:50  3    Q.  All right.  What did you do?

09:08:52  4    **A.  Waited for the vehicle to get a little bit of distance**

09:08:56  5    **away from us to the west, and then I turned on our headlights**

09:09:01  6    **of our vehicle and turned around and began to follow the**

09:09:03  7    **vehicle.**

09:09:04  8    Q.  Okay.  What street were you on at this time?

09:09:06  9    **A.  Eleventh Street.**

09:09:07  10   Q.  All right.  When you turned around, do you know an

09:09:13  11   approximate distance you were behind the Saturn Vue and

09:09:17  12   yourself?

09:09:19  13   **A.  I was probably approximately a couple hundred yards.**

09:09:23  14   Q.  Okay.  So what did you do?

09:09:26  15   **A.  We followed the vehicle, and it basically went in a**

09:09:29  16   **straight line down Eleventh Street for several blocks.**

09:09:32  17   Q.  All right.  And you say "a straight line."  Does

09:09:36  18   Eleventh Street go straight the entire time?

09:09:38  19   **A.  It curves a little bit in some places around the river,**

09:09:41  20   **but more or less it was heading westbound on Eleventh the**

09:09:46  21   **entire time, other than a few curves here and there.**

09:09:47  22   Q.  All right.  Did you -- were you able to observe this

09:09:51  23   vehicle the entire time?

09:09:52  24   **A.  Yes.**

09:09:52  25   Q.  Between the time that you did the U-turn and the time

| 09:09:56 | 1 | that you completed the traffic stop, was this vehicle ever out |
|---|---|---|
| 09:10:01 | 2 | of sight of your line of sight? |
| 09:10:04 | 3 | **A.   No.** |
| 09:10:04 | 4 | Q.   How much other traffic was on the road at this time? |
| 09:10:06 | 5 | **A.   There was no other traffic on Eleventh Street.** |
| 09:10:10 | 6 | Q.   Okay.  Approximately how long did you -- well, let me |
| 09:10:13 | 7 | ask you this:  Were there a number of stop signs between the |
| 09:10:16 | 8 | time that you turned around and began following the vehicle and |
| 09:10:19 | 9 | the time that you made a traffic stop? |
| 09:10:21 | 10 | **A.   I believe there was at least two stop signs.  I don't** |
| 09:10:24 | 11 | **know exactly how many there were, but I remember at least two.** |
| 09:10:26 | 12 | Q.   Okay.  And then what occurred that made you make a |
| 09:10:31 | 13 | decision to stop this vehicle? |
| 09:10:34 | 14 | **A.   At the intersection of Eleventh and Perry, I observed** |
| 09:10:38 | 15 | **that the vehicle failed to signal a turn 100 feet.** |
| 09:10:41 | 16 | Q.   All right.  Can you go ahead and describe what you |
| 09:10:43 | 17 | observed to the Court. |
| 09:10:44 | 18 | **A.   In my estimation, the vehicle did not signal its turn** |
| 09:10:50 | 19 | **until it was approximately 20 feet away from the intersection.** |
| 09:10:54 | 20 | **There was a parked car that was on the north side of Eleventh** |
| 09:11:00 | 21 | **Street which was approximately 50 feet away from the** |
| 09:11:03 | 22 | **intersection itself.  I estimate my footage based on car** |
| 09:11:10 | 23 | **lengths.  I know that an average car is approximately 15 feet.** |
| 09:11:14 | 24 | **And based on what I observed, the Saturn Vue did not activate** |
| 09:11:21 | 25 | **its signal until it was approximately one and a half to two car** |

8-2-16   USA v. REYES No. 15-10119

12

09:11:25  1  **lengths away from the intersection.**

09:11:26  2  Q.  Okay.  Did you make that estimation as you were

09:11:28  3  following it from behind, or did you make that estimation as

09:11:32  4  you approached the stop sign, or did they work in conjunction

09:11:35  5  together?

09:11:35  6  **A.  Worked in conjunction together.**

09:11:37  7  Q.  Can you explain that?

09:11:39  8  **A.  I kind of picked out a visual point past the parked car**

09:11:44  9  **that I observed.  At the time of the violation, we weren't but**

09:11:50  10  **probably 3- to 400 feet away, behind the Saturn Vue.**

09:11:53  11  Q.  Okay.  And then once you approached the stop sign

09:11:57  12  yourself, were you able to determine how far that parked car

09:12:02  13  was from the stop sign?

09:12:03  14  **A.  Yes.  Once we got closer, I estimated that the parked**

09:12:05  15  **car was approximately 50 feet away.**

09:12:07  16  Q.  Did you observe the Saturn Vue drive around that parked

09:12:12  17  vehicle?

09:12:13  18  **A.  Yes.  It kind of veered to the left around it as it**

09:12:16  19  **approached the stop sign.**

09:12:17  20  Q.  All right.  And at the time that it did that, did it

09:12:21  21  have a turn signal on?

09:12:22  22  **A.  No.**

09:12:23  23  Q.  When did you see that turn signal go on?

09:12:25  24  **A.  After the parked car.**

09:12:27  25  Q.  Did that vehicle make a complete stop at the

8-2-16   USA v. REYES No. 15-10119

13

| | | |
|---|---|---|
| 09:12:33 | 1 | intersection? |
| 09:12:34 | 2 | **A.  Yes.** |
| 09:12:39 | 3 | Q.   And again, at this time period you were observing this |
| 09:12:42 | 4 | vehicle, there were no vehicles between you and the Saturn Vue; |
| 09:12:45 | 5 | is that correct? |
| 09:12:46 | 6 | **A.  Correct.** |
| 09:12:48 | 7 | Q.   So what occurs once you reach the intersection of |
| 09:12:53 | 8 | Eleventh and Perry? |
| 09:12:54 | 9 | **A.  Officer Henry and I decided that we were going to** |
| 09:12:57 | 10 | **initiate a traffic stop with the vehicle at this point.  And it** |
| 09:13:01 | 11 | **was already traveling northbound on Perry approaching** |
| 09:13:05 | 12 | **Thirteenth Street by that point.  So just south of the stop** |
| 09:13:08 | 13 | **sign at Thirteenth on Perry, we initiated the traffic stop and** |
| 09:13:12 | 14 | **I operated the emergency lights on the top of our patrol** |
| 09:13:16 | 15 | **vehicle.** |
| 09:13:16 | 16 | Q.   And then what occurred? |
| 09:13:19 | 17 | **A.  The vehicle was already stopped at the intersection** |
| 09:13:21 | 18 | **when we turned on the lights, but once we turned them on, the** |
| 09:13:24 | 19 | **vehicle -- actually, Officer Henry and I were starting to get** |
| 09:13:28 | 20 | **out of our patrol vehicle to approach the Saturn Vue and it** |
| 09:13:31 | 21 | **started to slow roll and make a right turn onto eastbound** |
| 09:13:35 | 22 | **Thirteenth Street.  So we immediately got back in our patrol** |
| 09:13:38 | 23 | **vehicle, at which time I activated the siren on the vehicle,** |
| 09:13:42 | 24 | **and at that point the vehicle continued to slow roll at a slow** |
| 09:13:46 | 25 | **rate of speed eastbound and then immediately pulled into a** |

09:13:50  1    parking lot, which was on the southeast corner of that

09:13:53  2    intersection and more or less made a U-turn to where it was

09:13:56  3    facing back to the west before it stopped.

09:14:00  4        Q.  But did the vehicle actually stop here then?

09:14:03  5        A.  Yes.

09:14:03  6        Q.  What did you all do?

09:14:05  7        A.  Based on the fact that we had initiated the traffic

09:14:09  8    stop and then the vehicle decided to continue to roll and turn,

09:14:12  9    I was fearful that either the driver was trying to hide

09:14:16 10    something or possibly was obtaining a weapon.  I had thoughts

09:14:19 11    of maybe we were going to be ambushed by the driver as we

09:14:24 12    approached.  So in my mind immediately I wanted to separate the

09:14:29 13    driver from that vehicle as quickly as possible and pat him

09:14:33 14    down for weapons for myself and Officer Henry's safety.

09:14:35 15        Q.  All right.  And did you do that?

09:14:37 16        A.  Yes.

09:14:37 17        Q.  How did that happen?  What did you say to him?

09:14:40 18        A.  I made contact on the driver's side of the vehicle and

09:14:43 19    the driver was the only occupant of the vehicle.  I immediately

09:14:45 20    asked him to shut off the vehicle and step out of the vehicle.

09:14:49 21    I don't believe he initially shut the vehicle off, but he was

09:14:52 22    compliant and stepped out of the vehicle.

09:14:55 23        Q.  All right.  I'm going to take a step back and ask you,

09:14:59 24    at this time that you all stopped, what lights did you have on

09:15:01 25    your vehicle to light up the area?

09:15:04  1      A.   We had our headlights on, as well as there's a

09:15:08  2  spotlight affixed to the driver's side of the vehicle which I

09:15:11  3  activated and turned on and pointed it towards the rear of the

09:15:15  4  vehicle, along with the red and blue lights on the top of our

09:15:18  5  patrol vehicle.

09:15:20  6      Q.   You asked the defendant to -- well, you asked the

09:15:23  7  driver of the vehicle to step out of the vehicle.  And you said

09:15:31  8  he was compliant?

09:15:32  9      A.   Yes.

09:15:32  10      Q.   What happened next?

09:15:34  11      A.   As I asked him to step out of the vehicle, my intention

09:15:37  12  was to pat him down for weapons for my safety, but I also went

09:15:40  13  ahead and asked him if he had a driver's license, and he told

09:15:42  14  me that he did not have a driver's license, and that it was

09:15:44  15  suspended.

09:15:48  16      Q.   Can you tell the Court, at this time in -- at this time

09:15:53  17  in May of 2015, do you recall what the policy was regarding

09:15:58  18  individuals who were driving with a suspended license?

09:16:01  19      A.   Generally, the policy on driving on a suspended was

09:16:07  20  initially mandatory booking.  There was some changes made to

09:16:11  21  where it was discretionary, whether it could be a booking or

09:16:14  22  released with a notice to appear.  Either way, they were taken

09:16:18  23  into custody and under arrest, and an arrest report was filled

09:16:21  24  out.  I don't recall what the actual policy stated at that

09:16:24  25  time, but it has always been discretionary whether they could

09:16:27  1    be booked or released with a notice to appear.

09:16:29  2        Q.   Okay.   So he stated to you at the time that his license

09:16:33  3    was suspended.   What did you do?

09:16:35  4        A.   I went to initially take him into custody on that, to

09:16:38  5    verify it.   I asked him to put his hands behind his back, at

09:16:42  6    which time he started to reach towards the right side of his

09:16:45  7    waistband.   And I noticed that there was a bulge on the right

09:16:47  8    side of his waistband, so I immediately grabbed on to both of

09:16:50  9    his wrists and held on to them and I advised Officer Henry to

09:16:54 10    come over and place handcuffs on him.

09:16:56 11        Q.   And did Officer Henry do that?

09:16:58 12        A.   Yes, he did.

09:17:00 13        Q.   After the suspect was in handcuffs, did you complete a

09:17:05 14    pat down?

09:17:06 15        A.   Yes.

09:17:06 16        Q.   What did you find?

09:17:08 17        A.   The bulge on the right side of his waistband that he

09:17:11 18    was reaching for was a leather holster that had a Taser in it

09:17:14 19    or a stun gun.   He also had a -- upon a search, he had a Kansas

09:17:22 20    ID card that identified him as Jesus Reyes, as well as, I

09:17:27 21    believe, a pack of Marlboro Smooth cigarettes and a bandana.

09:17:36 22        Q.   Throughout this stop and eventually you ended up

09:17:40 23    booking Mr. Reyes into custody, is that correct?

09:17:43 24        A.   Yes.

09:17:44 25        Q.   Did you -- were you able to get a good look at

09:17:48  1    Mr. Reyes?

09:17:48  2        **A.   Yes.**

09:17:49  3        Q.   Do you see him in the courtroom here today?

09:17:50  4        **A.   Yes.**

09:17:50  5        Q.   Would you please go ahead and identify him for the

09:17:53  6    Court at this time.

09:17:53  7        **A.   He's wearing the blue jumpsuit, Hispanic male at the**

09:17:57  8    **table there.**

09:17:59  9        Q.   So once you've patted him down and you have him in

09:18:02  10   handcuffs, what occurs?

09:18:04  11       **A.   I immediately asked him for consent to search the**

09:18:08  12   **vehicle.  And his response to me was that it was not his**

09:18:11  13   **vehicle, and he alluded to the fact that he did not want us to**

09:18:15  14   **search it.**

09:18:17  15           **Officer Henry was standing by us at this point.  We**

09:18:20  16   **were still outside of the vehicle.  And Officer Henry**

09:18:23  17   **immediately made a request to dispatch to start a K-9 to our**

09:18:26  18   **stop, based on the suspicion that we had, reference to the drug**

09:18:31  19   **tip, along with the prior stop that I'd had leaving that**

09:18:35  20   **location which resulted in a drug seizure.**

09:18:48  21       Q.   Once Officer Henry called for a K-9, do you know, were

09:18:55  22   you able to hear Officer Henry make this call?

09:18:57  23       **A.   Yes, I believe he was standing right next to myself and**

09:19:00  24   **Mr. Reyes.**

09:19:00  25       Q.   And how does he make that call?  Did he do it on his

09:19:03   1   cell phone, on his radio?  Did he have to get into the car?

09:19:05   2       **A.   On the radio.**

09:19:06   3       Q.   When I say "on the radio," on the ones that are

09:19:08   4   attached to your vest?

09:19:10   5       **A.   Yes.**

09:19:11   6       Q.   And you said that Mr. Reyes was standing next to you as

09:19:17   7   well when this occurred?

09:19:19   8       **A.   Yes.**

09:19:20   9       Q.   Did Mr. Reyes make any comments that you overheard

09:19:23  10   after Officer Henry requested a K-9?

09:19:27  11       **A.   I believe once Officer Henry requested it on the radio,**

09:19:30  12   **he explained to Mr. Reyes that we were going to have a K-9 come**

09:19:34  13   **sniff the vehicle for drugs.  And I believe he made some notion**

09:19:41  14   **to Mr. Reyes that -- asking him what he was worried about in**

09:19:44  15   **the car, why he did not want us to search it.  And at that**

09:19:48  16   **point Mr. Reyes made a statement that there was just a blunt in**

09:19:54  17   **the vehicle and, through my training and experience, I**

09:19:56  18   **recognized a blunt to mean a marijuana cigar or cigarette.**

09:20:04  19       Q.   What occurs at that time?

09:20:07  20       **A.   I walked Mr. Reyes back to our patrol vehicle and I had**

09:20:11  21   **him have a seat in the rear, and Officer Henry went up to the**

09:20:14  22   **vehicle on the -- I believe on the passenger side floorboard**

09:20:17  23   **and located this blunt that Mr. Reyes was talking about.  And I**

09:20:22  24   **learned from Officer Henry that this was a brown, hand-rolled**

09:20:26  25   **cigar or cigarette, which contained marijuana.**

09:20:28    1    Q.   Okay.  What did you do at that point?

09:20:32    2    **A.   At that point Officer Henry began to search the**

09:20:35    3    **remainder of the vehicle and I stood by with Mr. Reyes.  And I**

09:20:38    4    **ran him through our system called SPIDER, which runs**

09:20:42    5    **individuals for wants and warrants.  I learned that his**

09:20:45    6    **driver's license was suspended and he also had a warrant for**

09:20:48    7    **Sedgwick County as well as a Kansas Department of Corrections**

09:20:51    8    **absconder warrant.**

09:20:52    9    Q.   All right.  Did you notify Mr. Reyes of this?

09:20:55    10    **A.   Yes.  And he had actually made a statement to me**

09:20:57    11    **earlier that he was an absconder.**

09:21:01    12    Q.   Did you question what he meant by that?

09:21:04    13    **A.   No.  I knew that he meant that he had a Kansas**

09:21:07    14    **Department of Corrections warrants.  That's generally what**

09:21:09    15    **they're called, absconder warrants.**

09:21:11    16    Q.   Okay.  So once you have figured out that he has

09:21:14    17    warrants for him and you have him -- would you say he was under

09:21:17    18    arrest at this point?

09:21:18    19    **A.   Yes.**

09:21:18    20    Q.   For what offenses?

09:21:19    21    **A.   The driving while suspended, along with the traffic**

09:21:23    22    **violation and the warrants.**

09:21:24    23    Q.   Okay.  So once you have him in custody or at least

09:21:28    24    detained and handcuffed, what do you do?

09:21:31    25    **A.   By this point I already knew that Officer Henry had**

8-2-16  USA v. REYES No. 15-10119

20

09:21:34   1   located the marijuana cigar or cigarette in the vehicle, so I

09:21:37   2   went ahead and advised Mr. Reyes of his *Miranda* rights.

09:21:41   3       Q.   Do you know what time you advised him of his *Miranda*

09:21:44   4   rights?

09:21:44   5       A.   00:07 hours.

09:21:46   6       Q.   So that would be 12:07 P.M.?

09:21:50   7       A.   12:07 A.M.

09:21:51   8       Q.   A.M.   Thank you.

09:21:53   9       A.   Yes, ma'am.

09:21:55   10      Q.   When you advised Mr. Reyes of his *Miranda* rights, how

09:21:58   11   did you do that?

09:22:00   12      A.   We were issued a Wichita Police Department *Miranda*

09:22:04   13   card, which has the *Miranda* rights verbatim, and I read them

09:22:09   14   verbatim from that card every time that I read them.

09:22:14   15      Q.   And at the time you did this, where was Mr. Reyes?

09:22:16   16      A.   He was seated in the rear of my patrol vehicle, and I

09:22:20   17   was standing on the outside, with the door open.

09:22:23   18      Q.   Okay.   At this time were Mr. Reyes' hands cuffed in

09:22:30   19   front or behind him?

09:22:31   20      A.   They were behind his back.

09:22:32   21      Q.   During your encounter with Mr. Reyes throughout the

09:22:34   22   night, I know you earlier stated you recognized him as a

09:22:38   23   Hispanic male.   Did you have any problems speaking with

09:22:41   24   Mr. Reyes -- well, let me ask you this:   Were you speaking with

09:22:46   25   Mr. Reyes in English?

09:22:47  1      A.   Yes.

09:22:47  2      Q.   Did you appear to have any problems or any language

09:22:51  3   barrier in speaking with Mr. Reyes?

09:22:53  4      A.   No.

09:22:54  5      Q.   Do you believe that he was able to understand your

09:22:57  6   questions?

09:22:57  7      A.   Yes.

09:22:57  8      Q.   Was he responding appropriately to your questions?

09:23:01  9      A.   Yes.

09:23:01  10     Q.   And when he spoke to you, was he speaking in English?

09:23:05  11     A.   Yes.

09:23:06  12     Q.   And, again, were you able to understand him without any

09:23:11  13  kind of language barrier?

09:23:15  14     A.   Yes.

09:23:19  15     Q.   Once you read the *Miranda* warnings to Mr. Reyes, did

09:23:23  16  you question whether or not he would answer questions?

09:23:26  17     A.   Yes.

09:23:26  18     Q.   And how did he respond?

09:23:27  19     A.   **He stated that he would answer questions.**

09:23:29  20     Q.   And, again, did he tell you if he understood the

09:23:32  21  warnings that had been read to him or his rights that had been

09:23:35  22  read to him?

09:23:36  23     A.   **Yes, he said he understood.**

09:23:37  24     Q.   What did you speak with Mr. Reyes about at that time?

09:23:41  25     A.   **I initially asked him about his driver's license, and**

09:23:45   1    he told me that that had been suspended for some time.  I asked

09:23:48   2    him about the vehicle, and he told me that the vehicle belonged

09:23:51   3    to his girlfriend, and that he had borrowed it from her.  I

09:23:55   4    then asked him about the marijuana cigar or cigarette.  He

09:24:01   5    stated to me that that belonged to him and that he smokes

09:24:05   6    marijuana on a regular basis, and that he'd actually smoked

09:24:08   7    some earlier today.

09:24:10   8       Q.   What did he tell you about his girlfriend who he said

09:24:13   9    was the owner of the vehicle?

09:24:16   10      A.   I have my report here.  Can I refer to that?

09:24:18   11      Q.   Well, let's take a few steps back then.  Would you tell

09:24:21   12   the Court, do you write a report after every traffic infraction

09:24:26   13   or arrest; what is your policy?

09:24:28   14      A.   Typically on arrests or any type of police action

09:24:32   15   taken, we made what's called an incident report.  And then

09:24:35   16   generally, if there's an arrest, there's an arrest report to go

09:24:37   17   with that.  And reports with a lot of detail we call what's

09:24:44   18   called an Ediphone in, which is basically where we call our

09:24:50   19   report in over the phone, and it's dictated and typed by a

09:24:53   20   typist.

09:24:53   21      Q.   Is that what occurred in this case?

09:24:54   22      A.   Yes, I have my Ediphone report.

09:24:57   23      Q.   All right.  And after you called in your Ediphone

09:25:00   24   report, did you have an opportunity after you did that to

09:25:01   25   review that report?

09:25:03  1      A.   Yes.

09:25:03  2      Q.   Is that, in fact, the report that's been turned over to

09:25:05  3  the United States and then presented to the defense counsel?

09:25:07  4  You probably don't know if it's been presented.  Is that the

09:25:10  5  report that's been turned over to the United States?

09:25:11  6      A.   Yes.

09:25:14  7      Q.   In reviewing that report, is it a clear and accurate

09:25:17  8  depiction of the events that occurred that night?

09:25:18  9      A.   Yes.

09:25:18  10     Q.   Is it accurate as to your statements that you made into

09:25:22  11  the Ediphone?

09:25:23  12     A.   Yes.

09:25:23  13     Q.   And that's the same report that you have with you right

09:25:25  14  now?

09:25:26  15     A.   Yes.

09:25:28  16          MS. JACOBS:  Your Honor, can he refresh his memory

09:25:30  17  with his report?

09:25:31  18          THE COURT:  He may.

09:25:51  19          (Brief pause.)

09:26:02  20     A.   **Mr. Reyes stated to me that the vehicle belonged to his**

09:26:05  21  **girlfriend of approximately a week named Samantha, and that he**

09:26:09  22  **had borrowed the vehicle from her earlier that evening.**

09:26:12  23  BY MS. JACOBS:

09:26:12  24     Q.   Was he able to tell you any other information about

09:26:15  25  Samantha?

8-2-16   USA v. REYES No. 15-10119

24

09:26:16   1        A.   Just that her address was somewhere on 27th Street, I

09:26:20   2   believe.

09:26:20   3        Q.   Did he even know her last name?

09:26:23   4        A.   No.

09:26:24   5        Q.   All right.  So you continued to question Mr. Reyes.  Is

09:26:28   6   he still at this point sitting in the back seat of your

09:26:31   7   vehicle?

09:26:31   8        A.   Yes.

09:26:31   9        Q.   All right.  And you're still standing outside the

09:26:34   10  vehicle?

09:26:34   11       A.   Yes.

09:26:34   12       Q.   All right.  Did you talk to him about why he was on

09:26:37   13  parole?

09:26:40   14       A.   I don't remember there being a whole lot of discussion

09:26:43   15  about that.

09:26:44   16       Q.   Okay.  Did he tell you why he believed he was an

09:26:46   17  absconder?

09:26:46   18       A.   I believe he told me that he had missed a meeting with

09:26:49   19  his parole officer.

09:26:51   20       Q.   While you're having this conversation with him, at any

09:26:55   21  point did you stop interacting or conversing with Mr. Reyes and

09:26:59   22  talk with your partner, Officer Henry?

09:27:01   23       A.   Yes.

09:27:01   24       Q.   Can you tell the Court about that conversation.

09:27:04   25       A.   Yes, I recontacted Officer Henry, who was searching the

09:27:07  1    vehicle, and he told me about additional items that he had

09:27:11  2    located in the vehicle.  He advised me that there was a

09:27:17  3    backpack which he had located in the rear of the vehicle that

09:27:21  4    had some items that had Mr. Reyes' name on it, which also this

09:27:27  5    same backpack also had two firearms in it.

09:27:30  6         Officer Henry also told me that there was some drug

09:27:33  7    paraphernalia located in the vehicle, that being a marijuana

09:27:36  8    pipe, a digital scale, and he also told me that, in the roof

09:27:44  9    sunglass holder of the vehicle, he had located some crystal

09:27:49  10   substance which he believed to be methamphetamine.

09:27:51  11   Q.   Did you question Mr. Reyes about the information that

09:27:56  12   Mr. Henry provided to you?

09:27:57  13   A.   Yes, I did.

09:28:01  14   Q.   Well, let's go ahead and start with the items that were

09:28:03  15   located in the back seat, that being the bag and the contents.

09:28:08  16   What did he tell you?

09:28:08  17   A.   When I initially asked him about the backpack,

09:28:12  18   Mr. Reyes told me that he didn't know anything about that.  I

09:28:16  19   then told him that there were items in that bag that had his

09:28:19  20   name on it, at which time he did tell me that that backpack and

09:28:24  21   the items in it did belong to him.  He stated to me that the

09:28:28  22   firearms did belong to him, one of which he had purchased a

09:28:34  23   short time before this stop, I think it was approximately a

09:28:39  24   week, that he had purchased for $40, and then the other one he

09:28:46  25   stated that he had had for some time.

09:28:48   1        He told me that these firearms were for his protection,

09:28:53   2   due to a recent falling out with an ex-girlfriend and some

09:28:57   3   threats from her family.

09:29:05   4   Q.   Did you question the defendant about any kind of gang

09:29:09   5   affiliation?

09:29:10   6   A.   Yes, I did.   I asked him if he was a gang member at

09:29:13   7   all, and he told me that he knew that we had him on file as a

09:29:17   8   VLB or Vato Loco Boys gang member.

09:29:21   9   Q.   And what did he say?

09:29:23   10  A.   He just stated that he used to bang with the VLBs.

09:29:28   11  Q.   Did you question him about the methamphetamine that was

09:29:31   12  located in the sunglass compartment?

09:29:34   13  A.   Yes.

09:29:35   14  Q.   And what did he say?

09:29:36   15  A.   Initially he denied any knowledge of the

09:29:39   16  methamphetamine.   I later told him, basically stating, "Are you

09:29:47   17  going to let your girlfriend take the fall for this?" and told

09:29:49   18  him that I believed it to be his.   And I advised him about the

09:29:52   19  drug tips that we had been given, reference to the residence he

09:29:57   20  was coming from.   And once I told him all those things, he did

09:30:02   21  state that the methamphetamine belonged to him and he made a

09:30:06   22  statement that he had fallen off the wagon and had started

09:30:08   23  using methamphetamine.

09:30:10   24  Q.   What did he -- did he make any statement -- well, at

09:30:16   25  some point during this conversation that you're having with

09:30:18    1    Mr. Reyes, did you -- well, let me ask you this:  Was he being

09:30:24    2    cooperative with you at this point?

09:30:25    3        A.   Yes, he was.

09:30:26    4        Q.   Engaging in the conversation?

09:30:28    5        A.   Yes.

09:30:28    6        Q.   Did you make a decision to change the way he was

09:30:32    7    handcuffed and change the way he was sitting in the vehicle?

09:30:35    8        A.   Yes, I did.

09:30:36    9        Q.   And how did you -- what did you do?

09:30:38   10        A.   He was being very cooperative and compliant.  I didn't

09:30:42   11    feel that he was going to try to fight myself or Officer Henry

09:30:45   12    or try to escape, so I did place his handcuffs in front of him

09:30:49   13    at that point.  And I also noticed that there was a drink in

09:30:54   14    the vehicle, and I asked him if he wanted something to drink

09:30:56   15    and he said yes, so I went and got him the drink from the

09:30:59   16    vehicle and allowed him to drink it while I talked with him.

09:31:02   17        Q.   Okay.  What did he tell you about the methamphetamine

09:31:06   18    that was located in the sunglass compartment?

09:31:09   19        A.   I asked him how much he thought it was.  And he told me

09:31:13   20    that he thought it was more than an eight ball but he wouldn't

09:31:16   21    state the amount.  And I knew, through my training and

09:31:18   22    experience, that an eight ball is commonly 3.5 grams,

09:31:22   23    approximately.  And Officer Henry had already alluded to the

09:31:26   24    fact that it was much more than that.

09:31:29   25             So I did ask him, based on that amount, I believed that

09:31:32  1   to be much larger than what would be considered a user amount,

09:31:35  2   in my experience.  I asked him if he sold or distributed that,

09:31:39  3   or gave methamphetamine to his friends.  He would not admit to

09:31:43  4   actually selling methamphetamine, but he did state that he

09:31:49  5   had -- would give it to his friends on a regular basis.

09:31:51  6       Q.  What did he tell you about his own methamphetamine use?

09:31:57  7       A.  Is it okay if I refer to my report again?

09:31:59  8       Q.  Yes.  Thank you for telling us.

09:32:23  9           (Brief pause.)

09:32:24  10      A.  Mr. Reyes stated to me that he smokes methamphetamine

09:32:26  11  on a daily basis.

09:32:29  12      Q.  At this point you have been told from Mr. Reyes that he

09:32:32  13  smokes not only marijuana but methamphetamine daily.  So I

09:32:36  14  guess I would like to know, while you're speaking with him,

09:32:39  15  again, was he able to understand your questions?

09:32:42  16      A.  Yes.

09:32:42  17      Q.  Did he appear to be under the influence?

09:32:44  18      A.  No.

09:32:46  19      Q.  Able to track your questions and answer them accurately

09:32:53  20  and understand what you were asking him?

09:32:54  21      A.  Yes.  He seemed calm.  He did not seem intoxicated, to

09:32:58  22  me.  He was able to answer all my questions without me having

09:33:02  23  to repeat them.  And he wasn't -- he just did not act impaired

09:33:07  24  or intoxicated at all.

09:33:08  25      Q.  Okay.  Was he jittery at all?

09:33:12  1    **A.   No.**

09:33:12  2    Q.   Falling asleep?

09:33:13  3    **A.   No.**

09:33:15  4    Q.   At what point -- well, at some point did you all allow

09:33:19  5    the girlfriend to come and take the vehicle from the scene?

09:33:22  6    **A.   Yes.**

09:33:22  7    Q.   And how did that occur?

09:33:23  8    **A.   I believe Officer Henry was able to contact her and**

09:33:28  9    **asked her to come to the car stop.**

09:33:34  10   Q.   At any point while you were having -- well, let me just

09:33:37  11   follow up on that.  So you all took Mr. Reyes into custody and

09:33:40  12   she was allowed to leave with the vehicle; is that correct?

09:33:42  13   **A.   Yes.**

09:33:43  14   Q.   All right.  At any point while you were having a

09:33:45  15   conversation with Mr. Reyes, did he request an attorney?

09:33:49  16   **A.   No.**

09:33:50  17   Q.   Did he state to you that he didn't want to answer any

09:33:53  18   more questions?

09:33:53  19   **A.   No.**

09:33:54  20   Q.   Did he do anything to make you believe that he was

09:33:57  21   invoking his rights under *Miranda* and wanted to stop an

09:34:00  22   interview?

09:34:01  23   **A.   No.**

09:34:15  24            MS. JACOBS:  Thank you.  I have no further

09:34:16  25   questions at this time, Your Honor.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 09:34:17 | 1  | THE COURT:  Officer, I'm just confused on one                |
| 09:34:20 | 2  | point.                                                       |
| 09:34:20 | 3  | THE WITNESS:  Yes, sir.                                       |
| 09:34:21 | 4  | THE COURT:  You indicated that towards the front             |
| 09:34:23 | 5  | end of this stop that you requested a K-9 unit.  Did that unit |
| 09:34:26 | 6  | ever arrive?                                                 |
| 09:34:28 | 7  | THE WITNESS:  No, sir.  It was disregarded once              |
| 09:34:29 | 8  | his statement was made about the blunt being in the vehicle. |
| 09:34:32 | 9  | THE COURT:  All right.  Thank you.                           |
| 09:34:33 | 10 | Mr. Sevart, you may cross-examine.                           |
| 09:34:34 | 11 | MR. SEVART:  Thank you, Your Honor.                          |
| 09:34:36 | 12 | (Whereupon, a sotto voce discussion was had                  |
| 09:34:36 | 13 | between Mr. Sevart and the defendant.)                       |
| 09:34:44 | 14 | CROSS-EXAMINATION                                            |
| 09:34:44 | 15 | BY MR. SEVART:                                               |
| 09:34:55 | 16 | Q.  Officer, you doing okay?  You need a break or anything?  |
| 09:34:57 | 17 | **A.  Yes, sir.  I'm doing fine.  Thank you.**               |
| 09:34:59 | 18 | Q.  Okay.  I'm going to kind of go backwards here a little   |
| 09:35:04 | 19 | bit.  Let's talk about the communication that you had with my |
| 09:35:09 | 20 | client.  Before any *Miranda* was ever brought up or mentioned, |
| 09:35:24 | 21 | he was asked why he didn't want the car searched.  Isn't that |
| 09:35:27 | 22 | correct?                                                     |
| 09:35:27 | 23 | **A.  I believe Officer Henry more or less asked him what he** |
| 09:35:34 | 24 | **was worried about in the vehicle.  I don't know the direct** |
| 09:35:36 | 25 | **statement.  You'd have to ask Officer Henry that.**        |

09:35:39  1    Q.   But, clearly, that was not a statement of

09:35:42  2  identification of who you are; correct?

09:35:44  3    **A.   Correct.**

09:35:45  4    Q.   Or where are you going or anything of that sort;

09:35:49  5  correct?

09:35:49  6    **A.   Correct.**

09:35:49  7    Q.   That is a statement seeking really incriminating

09:35:56  8  information; correct?

09:35:57  9    **A.   Well, I believe he was just trying to understand why he**

09:36:01  10  **did not want us to search the vehicle.**

09:36:02  11    Q.   Okay.  But, I mean, generally speaking, people have a

09:36:06  12  constitutional right not to be subjected to unreasonable

09:36:09  13  searches and seizures; correct?

09:36:11  14    **A.   Correct.**

09:36:12  15    Q.   And so really somebody doesn't have to give a reason

09:36:16  16  for not wanting their property searched, because it's a

09:36:19  17  constitutional right of Americans; correct?

09:36:22  18    **A.   Correct.**

09:36:22  19    Q.   So when you're asking somebody to -- "Why are you

09:36:26  20  exercising your constitutional right here?" really what you're

09:36:29  21  trying to do is to solicit some sort of incriminating response;

09:36:33  22  right?

09:36:34  23    **A.   Well, I don't know if that's what Officer Henry's**

09:36:36  24  **intention was when he said that, but --**

09:36:39  25    Q.   Needless to say, as a result of that, an incriminating

| | | |
|---|---|---|
| 09:36:43 | 1 | statement was made; correct? |
| 09:36:45 | 2 | **A.   Yes.** |
| 09:36:47 | 3 | Q.   Correct? |
| 09:36:47 | 4 | **A.   Yes.** |
| 09:36:48 | 5 | Q.   And before that incriminating statement was made, there |
| 09:36:54 | 6 | wasn't any plain-view observation of any drugs; correct? |
| 09:36:58 | 7 | **A.   Not on my part, no.** |
| 09:36:59 | 8 | Q.   Okay.  There wasn't any smell of marijuana; correct? |
| 09:37:04 | 9 | **A.   No.** |
| 09:37:05 | 10 | Q.   There wasn't any, you know, actions on his part that |
| 09:37:16 | 11 | would suggest that he was under the influence of any sort of |
| 09:37:19 | 12 | substance; correct? |
| 09:37:20 | 13 | **A.   Correct.** |
| 09:37:20 | 14 | Q.   And so, really, at that point in time it's really a |
| 09:37:26 | 15 | question of whether or not there was a turn signal violation; |
| 09:37:30 | 16 | correct? |
| 09:37:31 | 17 | **A.   Yes.** |
| 09:37:31 | 18 | Q.   Okay.  And just so we're clear, this was not a DUI |
| 09:37:38 | 19 | stop; correct? |
| 09:37:38 | 20 | **A.   Correct.** |
| 09:37:39 | 21 | Q.   And there was no indication of any impairment or drug |
| 09:37:44 | 22 | usage, as you've testified with respect to the communication; |
| 09:37:49 | 23 | correct? |
| 09:37:49 | 24 | **A.   Correct.** |
| 09:37:52 | 25 | Q.   So certainly nothing in behavior-wise that would |

| | | |
|---|---|---|
| 09:37:56 | 1 | suggest that there was drugs in the vehicle; correct? |
| 09:37:59 | 2 | **A.   Not based on behavior, no.** |
| 09:38:01 | 3 | Q.   Okay.  Now, with respect to the setting, where it's |
| 09:38:10 | 4 | dark outside; correct? |
| 09:38:11 | 5 | **A.   Yes.** |
| 09:38:11 | 6 | Q.   There's you and another police officer; correct? |
| 09:38:14 | 7 | **A.   Correct.** |
| 09:38:17 | 8 | Q.   You look pretty strong.  Do you know how much you |
| 09:38:20 | 9 | bench-press? |
| 09:38:21 | 10 | **A.   Couldn't tell you.** |
| 09:38:22 | 11 | Q.   Okay.  Do you work out on a regular basis? |
| 09:38:24 | 12 | **A.   Yes.** |
| 09:38:24 | 13 | Q.   You appear to be fit.  You're bigger, stronger than my |
| 09:38:29 | 14 | client; correct? |
| 09:38:30 | 15 | **A.   I don't know if I'm stronger than him.  I'm taller than** |
| 09:38:33 | 16 | **him, yes.** |
| 09:38:33 | 17 | Q.   Okay.  And you've got your partner with you; correct? |
| 09:38:36 | 18 | **A.   Yes.** |
| 09:38:36 | 19 | Q.   You guys are clearly in control of the scene; correct? |
| 09:38:40 | 20 | **A.   Yes.** |
| 09:38:40 | 21 | Q.   You guys are wearing your black uniforms; correct? |
| 09:38:45 | 22 | **A.   Yes.** |
| 09:38:45 | 23 | Q.   With the military-style vest; correct? |
| 09:38:49 | 24 | **A.   Yes, exterior vest, yes.** |
| 09:38:51 | 25 | Q.   Okay.  You've got a gun, extra bullets, |

09:38:57  1    intimidating-looking; correct?

09:39:00  2        A.   Police uniform.  I wouldn't call it intimidating.

09:39:03  3        Q.   Well, you're not wearing your soft blues, are you?

09:39:06  4        A.   I guess that's up to opinion.

09:39:08  5        Q.   Let me ask you this:  I mean, are you trained to look

09:39:12  6    intimidating?

09:39:12  7        A.   No.

09:39:12  8        Q.   Then why don't you wear just ordinary blue police

09:39:16  9    uniforms?

09:39:16  10       A.   This is our assigned SCAT uniform.

09:39:18  11       Q.   But isn't the whole point of SCAT to kind of take over

09:39:22  12   the situation?

09:39:23  13       A.   To take over a scene of a violent crime, yes.

09:39:26  14       Q.   Yeah.  And you guys dress accordingly; correct?

09:39:31  15       A.   Dress in what they tell us to wear.

09:39:33  16       Q.   Well, I understand you may not be making the policy

09:39:38  17   decision, but needless to say, the Wichita Police Department

09:39:42  18   has softer uniforms, don't they?

09:39:45  19       A.   They have different-colored uniforms.  (Nods head.)

09:39:47  20       Q.   Yeah, and traditional blue uniforms; correct?

09:39:51  21       A.   Well, they're actually brown and tan.  And we also have

09:39:55  22   a green-and-tan uniform.

09:39:56  23       Q.   Okay.  Sometimes they even wear T-shirts, don't they?

09:39:59  24       A.   I think the gang unit wears T-shirts.  They're about

09:40:02  25   the only ones.

09:40:05  1       Q.   You -- would you admit to the Court that this is a

09:40:09  2   pretty intimidating situation for a Hispanic male and two

09:40:14  3   heavily armed law enforcement officers that have him detained,

09:40:19  4   you know, in a kind of a dark street?

09:40:22  5       **A.   I'm not sure what you're asking me.**

09:40:24  6       Q.   Well, wouldn't you agree that that was an intimidating

09:40:27  7   situation?

09:40:29  8       **A.   I wouldn't think of it as an intimidating situation.**

09:40:33  9   **It was a car stop.**

09:40:34  10       Q.   Well, but you're in charge; right?

09:40:36  11       **A.   Yes.**

09:40:36  12       Q.   So you may not be intimidated, but wouldn't you -- I

09:40:41  13   mean, wouldn't you agree that part of your dress and your

09:40:45  14   conduct, that you're trained to take over the situation?

09:40:50  15       **A.   Yes.**

09:40:50  16       Q.   And to be the intimidator, so to speak, so that you can

09:40:56  17   have the upper hand on the situation?

09:40:59  18       **A.   Well, we're in charge when we stop someone, yes.**

09:41:02  19       Q.   Okay.  Now, likewise, your job that particular night,

09:41:20  20   as you described it, is that you were a member of the SCAT

09:41:23  21   team; correct?

09:41:24  22       **A.   Yes.**

09:41:25  23       Q.   And SCAT is kind of a special operations sort of branch

09:41:32  24   of law enforcement; correct?

09:41:33  25       **A.   Yes.**

09:41:34  1       Q.   Would you agree that it's more of a military-style

09:41:37  2    policing, as opposed to community, going out hugging the

09:41:43  3    neighborhood sort of policing?

09:41:44  4       **A.   I would consider it the enforcement arm of community**

09:41:46  5    **policing.**

09:41:47  6       Q.   Okay.  The strong guys?

09:41:49  7       **A.   Well, we have a lot of weak guys, but I'm not sure what**

09:41:53  8    **you're getting at there.**

09:41:57  9       Q.   Well, and I appreciate that.  It's kind of a bad

09:42:00  10   question.  But I guess what I'm trying to get at is, you know,

09:42:04  11   there's been a lot of talk, I guess, in the newspapers and on

09:42:08  12   TV, and on both the state and local and national level, about,

09:42:14  13   you know, military-style policing versus, you know, having a

09:42:19  14   barbecue, community-style policing; would you agree?

09:42:22  15      **A.   Yes.**

09:42:22  16      Q.   And that one -- I mean, there's calls by some people

09:42:26  17   that police officers shouldn't even have to carry guns; they

09:42:29  18   ought to just be able to go out and help settle disputes.

09:42:32  19   Would you agree with that?

09:42:33  20      **A.   I don't agree with that at all.**

09:42:35  21      Q.   Well, maybe not the philosophy but you would agree that

09:42:38  22   people are talking about that, would you not?

09:42:39  23      **A.   Yes.**

09:42:39  24      Q.   Okay.  Your branch of law enforcement is 180 degrees

09:42:44  25   from that; correct?

09:42:45    1      **A.    SCAT is a specialty unit for community policing.  We're**

09:42:52    2  **assigned neighborhood complaints to work based on citizens or**

09:42:59    3  **members of the community calling in tips or complaints about**

09:43:03    4  **things going on in their neighborhood.  And we also work to --**

09:43:06    5  **if there is a violent crime, a shooting, stabbing, a murder,**

09:43:09    6  **et cetera, we're the ones that aggressively investigate that**

09:43:12    7  **for detectives.**

09:43:14    8      Q.   Right.  And that's, I think, what my point is trying to

09:43:17    9  be, is that you guys are the aggressive branch of the law

09:43:21   10  enforcement community?

09:43:22   11      **A.   Yes.**

09:43:22   12      Q.   Okay.  With that being said, on this particular night,

09:43:30   13  you see this car in this driveway; correct?

09:43:33   14      **A.   Yes.**

09:43:33   15      Q.   And so you're going to aggressively pursue that

09:43:38   16  vehicle; correct?

09:43:39   17      **A.   If it left the residence in a timely manner, yes.**

09:43:43   18  **We're not going to spend the whole night watching the residence**

09:43:45   19  **on one particular car.**

09:43:47   20      Q.   Okay.  But you, as you're sitting there, you're like a

09:43:54   21  hunter in the deer stand, so to speak, that you're wanting that

09:43:58   22  car to make a move so that you can stop it; correct?

09:44:02   23      **A.   Yes.**

09:44:02   24      Q.   And so before that car -- before anybody ever got in

09:44:07   25  that vehicle or took off, you already have the mind-set that,

09:44:11    1    "By God, we're going to get in that vehicle"; correct?

09:44:13    2        **A.   That's our hope.   We're trying to investigate the tip**

09:44:16    3    **or the drug complaint.**

09:44:17    4        Q.   Okay.

09:44:17    5        **A.   Try to prove that complaint right or wrong.**

09:44:19    6        Q.   Okay.   And so you're told, "Hey, that we've got these

09:44:22    7    rules over in court that you need to come up with some reason

09:44:26    8    for stopping the vehicle"; correct?

09:44:28    9        **A.   Yes.**

09:44:28   10        Q.   And then you need to come up for some reason for

09:44:30   11    getting inside of the vehicle; correct?

09:44:32   12        **A.   Yes.**

09:44:32   13        Q.   And so you know what the rules are; right?

09:44:35   14        **A.   Yes.**

09:44:35   15        Q.   So the thing that you sit there and do is go, "Okay,

09:44:41   16    well, we got to come up with a reason for stopping a car";

09:44:43   17    right?

09:44:44   18        **A.   Yes, it has to commit a traffic violation for us to be**

09:44:48   19    **able to stop it.**

09:44:49   20        Q.   Okay.   Or you have to come up and say they committed a

09:44:53   21    traffic violation; right?

09:44:54   22        **A.   Are you trying to call me a liar?**

09:44:55   23        Q.   Well, I haven't used that word.   If you want to use

09:44:59   24    that word, I suppose we can.   But the point being you know that

09:45:08   25    you have to come up with some reason for stopping this car;

09:45:11  1   right?

09:45:12  2      **A.   If it commits a traffic violation in front of me.  If**

09:45:14  3   **it doesn't commit any type of traffic violation, I can't stop**

09:45:17  4   **it.   There's been plenty of cars that have left complaint**

09:45:21  5   **houses in my past that have not committed traffic violations,**

09:45:25  6   **and eventually we turned the other way.**

09:45:27  7      Q.   Yeah, and they're not here so we can't verify that, can

09:45:30  8   we?

09:45:30  9      **A.   You're correct.**

09:45:30  10     Q.   We also can't verify what really happened with respect

09:45:35  11   to the turn signal, can we?

09:45:37  12     **A.   I guess we can't, other than --**

09:45:39  13     Q.   But you, on the other hand, had the ability to verify

09:45:45  14   what happened for reel, don't you?

09:45:47  15     **A.   Yes.**

09:45:48  16     Q.   But you didn't turn on any cameras to record any of

09:45:51  17   that, did you?

09:45:51  18     **A.   We did not have cameras at the time.**

09:45:53  19     Q.   Well, the police department has cameras.  You could

09:45:56  20   have armed yourself with a camera that night, couldn't you?

09:45:59  21     **A.   No.**

09:46:00  22     Q.   You --

09:46:01  23     **A.   Not at this time of this stop.**

09:46:02  24     Q.   You also could have gotten some permission from a court

09:46:06  25   or sought permission from a court to set up some sort of

8-2-16   USA v. REYES No. 15-10119

40

09:46:10  1   surveillance; correct?

09:46:12  2       A.   Are you talking about the residence itself?

09:46:14  3       Q.   The residence, the vehicle, any of this sort of

09:46:18  4   situation, you could have gone through proper channels of

09:46:21  5   asking the court for some permission; correct?

09:46:23  6       A.   I'm assuming we could have, yes.

09:46:24  7       Q.   Okay.  But you didn't do that?

09:46:26  8       A.   No.  I've never asked for surveillance on any residence

09:46:29  9   that I've done, as far as cameras and things of that nature.

09:46:31  10      Q.   You just take the personal, aggressive approach and

09:46:35  11  you're going to handle it out on the street without any

09:46:39  12  supervision from a detached magistrate; correct?

09:46:42  13      A.   Yes.

09:46:43  14      Q.   And so we go back to this thing about the traffic stop.

09:46:49  15  The reality is is that a turn signal was used, wasn't it?

09:46:52  16      A.   It was used, yes.

09:46:53  17      Q.   It's just in your opinion -- so you're slicing it even

09:46:57  18  thinner -- saying but it wasn't used for long enough?

09:47:01  19      A.   Yes.

09:47:02  20      Q.   And we don't have any verification as to what "long

09:47:08  21  enough" is, do we?

09:47:09  22      A.   As far as video and things of that nature, no, we don't

09:47:13  23  have videos.

09:47:13  24      Q.   We don't even have measurements, do we?

09:47:15  25      A.   No.

09:47:15  1        Q.    Now, you indicated that this was out on a residential

09:47:21  2   neighborhood; correct?

09:47:22  3        **A.    Correct.**

09:47:22  4        Q.    So the speed limit's 30 miles an hour, correct?

09:47:27  5        **A.    Generally, yes.**

09:47:28  6        Q.    Okay.   There's parked cars out on the street as well;

09:47:34  7   correct?

09:47:34  8        **A.    Yes.**

09:47:34  9        Q.    And there's a number of driveways intersecting this

09:47:39  10  Eleventh Street; correct?

09:47:40  11       **A.    Yes.**

09:47:40  12       Q.    And so if you turn your signal on too early, that's

09:47:46  13  going to mislead the people behind you, thinking that you're

09:47:48  14  turning into a driveway when reality is you're not; correct?

09:47:52  15       **A.    Well, turning your turn signal on too early I wouldn't**

09:47:55  16  **think would be an issue for anybody.   They know you're going to**

09:47:58  17  **make a turn eventually.**

09:47:59  18       Q.    Well, but if they're anticipating you're going to turn

09:48:02  19  into a driveway and you don't, that's how collisions happen,

09:48:05  20  isn't it?

09:48:06  21       **A.    No, collisions generally happen when someone's**

09:48:08  22  **following too close, if it's a rear-end collision.**

09:48:10  23       Q.    But -- and speaking of collisions, there weren't any

09:48:15  24  collisions in this case, were there?

09:48:16  25       **A.    No, sir.**

8-2-16   USA v. REYES No. 15-10119

42

09:48:16  1    Q.   You certainly had enough time to observe that the turn

09:48:20  2    signal was, in fact, on; correct?

09:48:22  3    **A.   Yes.  We were the only vehicle behind him.   There was**

09:48:25  4    **no other vehicles on the road.**

09:48:26  5    Q.   I know.  But what my point is is that the turn signal

09:48:29  6    was on certainly long enough for you to recognize that there

09:48:33  7    was a turn signal; correct?

09:48:34  8    **A.   Yes.**

09:48:35  9    Q.   And certainly long enough for you to say that you then

09:48:39  10   kind of looked around to see where parked cars or other things

09:48:43  11   were; correct?

09:48:44  12   **A.   Yes.**

09:48:44  13   Q.   So would you agree that the turn signal was on, oh, I

09:48:50  14   don't know, five seconds?

09:48:52  15   **A.   No.**

09:48:52  16   Q.   One thousand one, one thousand two, one thousand three,

09:48:55  17   one thousand four?

09:48:56  18   **A.   I couldn't testify to that.  I didn't count it out.  I**

09:48:59  19   **was looking for a reference point, as well as, like I'd**

09:49:02  20   **testified to earlier, car lengths before the stop sign.**

09:49:05  21   Q.   But it certainly wasn't a one thousand one, one

09:49:10  22   thousand two turn signal; correct?

09:49:11  23   **A.   He did not turn it on as he was at the intersection, if**

09:49:14  24   **that's what you're asking.**

09:49:14  25   Q.   Well --

8-2-16   USA v. REYES No. 15-10119

43

09:49:15  1      A.   It was a little bit before, what I estimated

09:49:19  2   approximately 20 feet before.

09:49:20  3      Q.   Well, and I understand your estimation.  The problem is

09:49:22  4   we don't have any way to gauge that, do we?

09:49:25  5      A.   I guess not.

09:49:26  6      Q.   Isn't it true your partner said he thought it was about

09:49:28  7   80 feet?

09:49:29  8      A.   You'd have to ask my partner that.  I don't know what

09:49:32  9   his report says.

09:49:32  10      Q.   Well, needless to say, it was certainly three or four

09:49:37  11   seconds; correct?

09:49:38  12      A.   I don't know the amount of time, sir.  I'm not going to

09:49:42  13   guess.

09:49:45  14      Q.   Well, nobody's asking you to guess, but you want to

09:49:48  15   speculate about feet.  Doesn't that require us to guess whether

09:49:51  16   your speculation is accurate or not?

09:49:53  17      A.   Yes.

09:49:53  18      Q.   Okay.  Unfortunately, we weren't there; right?

09:49:57  19      A.   Correct.

09:49:58  20      Q.   So we're not asking you to guess.  We're just asking

09:50:02  21   you to be honest about what happened.  Okay?

09:50:08  22      A.   Yeah.

09:50:08  23      Q.   And what I'm asking you is is was it one thousand one,

09:50:13  24   one thousand two, one thousand three, one thousand four, one

09:50:17  25   thousand five?  That's all I'm asking you.

09:50:19   1            MS. JACOBS:  Your Honor, I think he's already

09:50:20   2   testified that he's not able to answer that question, so --

09:50:23   3            THE COURT:  The objection's sustained.

09:50:51   4   BY MR. SEVART:

09:50:51   5   Q.  Would you also agree that you didn't use your turn

09:50:53   6   signal when you went around any cars that were parked on the

09:50:56   7   street, did you?

09:50:57   8   **A.  Used our turn signal to go around a parked car?**

09:51:00   9   Q.  Right.

09:51:01   10  **A.  No, we use turn signals to make turns on other streets.**

09:51:05   11  **We used our signal to turn onto Perry Street, yes.**

09:51:07   12  Q.  So there's no problem of, when you're driving down a

09:51:10   13  residential street, you don't have to use a turn signal every

09:51:13   14  time you're going around a parked vehicle; right?

09:51:15   15  **A.  No, I don't think that the -- was in question at all**

09:51:18   16  **going around the vehicle.**

09:51:19   17  Q.  Isn't it also true that after you made this stop, that

09:51:24   18  you called my client by some other name?

09:51:29   19  **A.  I'm not sure.**

09:51:30   20  Q.  Well, you want to look at your report?

09:51:38   21      (Brief pause.)

09:51:47   22  **A.  I don't see anywhere in here where I called him by any**

09:51:49   23  **other name.**

09:51:50   24  Q.  You don't recall calling him Cesar Reyes?

09:51:55   25  **A.  That might have been brought up, actually.  It's not in**

09:51:57   1    my report.  But he does look very similar to an individual that

09:52:03   2    I've dealt with in the past that's named Cesar Reyes.

09:52:05   3         Q.   Well, isn't it true that you thought that he was Cesar

09:52:09   4    Reyes?

09:52:09   5         A.   It's possible.

09:52:18   6         Q.   Well, again, I'm not asking you to guess.  I just want

09:52:22   7    to know, isn't it true you called him Cesar Reyes?

09:52:24   8         A.   I believe that's probably accurate, sir, yes, probably

09:52:28   9    initially thought he was Cesar Reyes when I walked up to the

09:52:31   10   vehicle.

09:52:35   11        Q.   Isn't it also true that, whenever you did stop my

09:52:38   12   client, he asked you, "What am I being stopped for?"

09:52:42   13        A.   I don't recall if he asked that or not.

09:52:44   14        Q.   Isn't it true you never told him what he was being

09:52:46   15   stopped for?

09:52:47   16        A.   I told him.

09:52:55   17        Q.   Isn't it true that, when you saw that parked car there,

09:52:59   18   you were going to do whatever it needed to get that car stopped

09:53:02   19   so that you could get inside of it?

09:53:03   20        A.   No.

09:53:03   21                  (Whereupon, a sotto voce discussion was had

09:53:14   22                  between Mr. Sevart and the defendant.)

09:53:50   23                  MR. SEVART:  Your Honor, no further questions.

09:53:52   24                  THE COURT:  Thank you, Mr. Sevart.  Redirect,

09:53:54   25   Ms. Jacobs?

09:53:54  1          MS. JACOBS:  Just a few follow-up, Your Honor.

09:53:58  2                    REDIRECT EXAMINATION

09:53:58  3  BY MS. JACOBS:

09:54:00  4      Q.  Officer Hornberger, the legal standard for making a

09:54:03  5  stop for failing or for a traffic -- let me try this again.

09:54:09  6  The standard for using a turn signal, does it have to do with

09:54:14  7  how long the turn signal is on or does it have to do with some

09:54:18  8  other standard?

09:54:18  9      A.  **One hundred feet ahead of time is the --**

09:54:21  10     Q.  So if somebody sat at a stop sign for a minute while

09:54:26  11  they were talking on their phone and their turn signal on,

09:54:30  12  that's not what you judge, is how long it's on?  It's the

09:54:32  13  distance; is that correct?

09:54:33  14     A.  **Correct.**

09:54:33  15     Q.  And in this case -- well let me ask you this.  Would

09:54:37  16  you agree that had that parked car not been on the street it

09:54:42  17  would have been very difficult for you to make a determination

09:54:45  18  when this individual turned on a turn signal?

09:54:48  19     A.  **No, I would still estimate it based on car lengths to**

09:54:51  20  **the stop sign, but that parked car was a reference point also**

09:54:55  21  **to distance.**

09:54:55  22     Q.  All right.  And, again, how -- how far was the parked

09:54:59  23  car from the stop sign?

09:55:01  24     A.  **Approximately 50 feet, in my estimation.**

09:55:03  25     Q.  And did you visually observe -- as you were following

09:55:07   1   this Saturn Vue, did you observe the vehicle go around the

09:55:10   2   parked vehicle?

09:55:10   3       A.   Yes.

09:55:11   4       Q.   And that was, again, on the right side of the road?

09:55:14   5       **A.   The parked vehicle was on the right or north side of**

09:55:17   6   **the road, yes.**

09:55:19   7       Q.   All right.  And when the Saturn Vue went around the

09:55:21   8   parked vehicle, was the turn signal on at that point?

09:55:24   9       **A.   No.**

09:55:25   10      Q.   All right.  And you didn't -- when did you observe the

09:55:27   11  turn signal come on?

09:55:28   12      **A.   After, after it had passed the parked vehicle.**

09:55:30   13      Q.   So your -- your reason for the stop, which is the

09:55:36   14  traffic violation for not using a turn signal within a hundred

09:55:39   15  feet, was verified by this parked vehicle and you were able to

09:55:42   16  make a determination; is that correct?

09:55:44   17      **A.   Yes.**

09:55:45   18              MS. JACOBS:  I have no further questions, Your

09:55:47   19  Honor.

09:55:47   20              THE COURT:  Anything further, Mr. Sevart?

09:55:50   21                  RECROSS-EXAMINATION

09:55:50   22  BY MR. SEVART:

09:55:51   23      Q.   Just so we're clear, you did not take any measurements

09:55:56   24  of where this parked car was; correct?

09:55:58   25      **A.   Correct.**

| | | |
|---|---|---|
| 09:55:59 | 1 | Q.   Something you very easily could have done; correct? |
| 09:56:03 | 2 | **A.   I don't carry a tape measure in my car or anything like** |
| 09:56:06 | 3 | **that, no.** |
| 09:56:07 | 4 | Q.   You certainly could call for someone, just like you |
| 09:56:09 | 5 | called for a dog, right? |
| 09:56:10 | 6 | **A.   We might be able to find one, yes.  We don't have them** |
| 09:56:14 | 7 | **sitting around the station.** |
| 09:56:16 | 8 | THE COURT:  May this witness step down? |
| 09:56:18 | 9 | MS. JACOBS:  Thank you, Your Honor. |
| 09:56:18 | 10 | THE COURT:  Officer, you may step down.  You're |
| 09:56:20 | 11 | excused from the court. |
| 09:56:20 | 12 | (Witness excused from the witness stand.) |
| 09:56:21 | 13 | THE COURT:  Ms. Jacobs, you may -- I gather you're |
| 09:56:23 | 14 | going to collect your next witness. |
| 09:56:25 | 15 | MS. JACOBS:  If you're ready, Your Honor.  Sorry, |
| 09:56:26 | 16 | I just assumed you want to move forward. |
| 09:56:29 | 17 | THE COURT:  No, you're absolutely correct. |
| 09:56:35 | 18 | Officer, if you would come stand in front of my |
| 09:56:38 | 19 | courtroom deputy, he'll swear you in and then you may have a |
| 09:56:40 | 20 | seat in the witness box. |
| 09:56:49 | 21 | OFFICER JARED HENRY, |
| 09:56:49 | 22 | having been first duly sworn to testify the truth, the whole |
| 09:56:50 | 23 | truth, and nothing but the truth, testified as follows: |
| 09:57:03 | 24 | DIRECT EXAMINATION |
| 09:57:03 | 25 | BY MS. JACOBS: |

09:57:12  1      Q.   Good morning.

09:57:13  2      A.   **Good morning.**

09:57:13  3      Q.   Would you please go ahead and state your name for the

09:57:15  4  record.

09:57:16  5      A.   **Jared Henry.**

09:57:17  6      Q.   And, Mr. Henry, how are you employed?

09:57:19  7      A.   **As a police officer with the City of Wichita.**

09:57:22  8      Q.   And is your correct title "officer"?

09:57:25  9      A.   **Yes.**

09:57:26  10     Q.   How long have you been employed with the City of

09:57:30  11  Wichita?

09:57:30  12     A.   **Since October of 2007.**

09:57:34  13     Q.   And what are your duties currently and are they the

09:57:36  14  same as they were back in May of 2015?

09:57:40  15     A.   **Slightly similar.  In May of 2015 I was assigned to the**

09:57:45  16  **Patrol North Special Community Action Team.  In that capacity**

09:57:50  17  **at that time my primary responsibility was to investigate**

09:57:53  18  **neighborhood complaints and respond to violent crime.**

09:57:56  19  **Currently at this time I'm still a member of the Special**

09:58:00  20  **Community Action Team in Patrol North; however, our primary**

09:58:03  21  **responsibility as to investigate violent crime now rather than**

09:58:06  22  **neighborhood complaints.**

09:58:07  23     Q.   All right.  At the time that you were working in May of

09:58:10  24  2015, did you usually work in conjunction or with a partner?

09:58:15  25     A.   **Yes.**

09:58:15  1     Q.   All right.  And who was that person in 2015?

09:58:18  2     **A.   Towards the middle and end of 2015, it was Officer**

09:58:24  3  **Chris Hornberger.**

09:58:24  4     Q.   All right.  Prior to May 29th of 2015, did you know

09:58:32  5  anything about a residence at the address of 409 West Eleventh

09:58:35  6  Street?

09:58:35  7     **A.   Yes, I did.**

09:58:36  8     Q.   What was the basis of that knowledge?

09:58:40  9     **A.   I had received an email from officer -- or Detective**

09:58:49  10  **Josh Hutchens in reference to a complaint he had received on a**

09:58:52  11  **SCAT hotline about an individual that lives at either 409 or**

09:58:56  12  **411 and nickname of Kid that was selling drugs.**

09:59:03  13     Q.   And are you aware -- and if you're not, please let the

09:59:05  14  Court know -- but is this the same email that Officer

09:59:09  15  Hornberger received, or was this a different one?

09:59:11  16     **A.   I believe Officer Hornberger received the same email I**

09:59:16  17  **did.**

09:59:16  18     Q.   Can you describe for the court what 409 and 411 West

09:59:21  19  Eleventh Street looks like.

09:59:21  20     **A.   Yes.  It's a single-story duplex residence on the south**

09:59:26  21  **side of Eleventh Street, just west of Waco.  409 is the**

09:59:32  22  **eastern-most half of the duplex.  It has a door on the east**

09:59:38  23  **side of the residence, which some would assume would be the**

09:59:41  24  **back door, as well as a door on the north side of the residence**

09:59:46  25  **that faces the street.  411 is the western-most unit of the**

09:59:51  1    residence.

09:59:52  2        Q.   All right.   Prior to May 29th of 2015, had you driven

09:59:57  3    by or viewed this residence before?

10:00:00  4        A.   I had driven by that location in the past, yes.

10:00:02  5        Q.   Was that in reference the drug complaint or was it just

10:00:05  6    on routine patrol?

10:00:06  7        A.   On routine patrol.

10:00:07  8        Q.   So what occurred on May 29th of 2015 regarding this

10:00:13  9    residence?

10:00:14  10       A.   At approximately 11:50 P.M. we had driven by that

10:00:18  11   location.   And Officer Hornberger was more familiar with that

10:00:21  12   location, had additional information that I didn't have at the

10:00:25  13   time, and he directed my attention to a white Saturn Vue that

10:00:30  14   was parked in the driveway just east of the structure.   That

10:00:36  15   Saturn Vue, I observed, had a 60-day tag on it, and we then

10:00:40  16   positioned our patrol car to the west of that location, behind

10:00:46  17   a parked vehicle, to monitor it.

10:00:48  18       Q.   All right.   How far away do you believe you parked from

10:00:51  19   the residence, if you know?

10:00:53  20       A.   I would guess approximately two blocks.

10:00:59  21       Q.   Where you were parked, were you able to see the

10:01:03  22   residence?

10:01:03  23       A.   I personally was not.

10:01:04  24       Q.   All right.   To your knowledge, was Officer Hornberger

10:01:06  25   able to see the residence?

10:01:08    1      A.   He told me that he could see the driveway.

10:01:12    2      Q.   Do you recall how long you sat there before you saw

10:01:15    3   this Saturn Vue move or leave the residence?

10:01:18    4      A.   I estimated approximately five minutes.

10:01:26    5      Q.   What happens once that Saturn Vue leaves the driveway?

10:01:30    6      A.   Officer Hornberger tells me that there's a vehicle

10:01:33    7   leaving.   He then tells me that it's coming west, towards our

10:01:36    8   location.   We were facing east at that time on the south curb

10:01:39    9   of Eleventh Street.   I then observed the white Saturn Vue that

10:01:44   10   appeared to be the same one that I observed in the driveway of

10:01:47   11   409 West Eleventh pass our location and continue west on

10:01:52   12   Eleventh Street.

10:01:53   13      Q.   All right.   When that Saturn Vue was sitting in the

10:01:58   14   driveway, were you able to view the license plate?

10:02:01   15      A.   I did observe that it was a 60-day tag; however, I

10:02:05   16   wasn't able to view the numbers or the expiration date.

10:02:08   17      Q.   So as you're sitting on Eleventh Street facing east and

10:02:12   18   the Vue goes by you driving or traveling west, what do you all

10:02:17   19   do?

10:02:17   20      A.   We wait for it to continue west for a short period of

10:02:22   21   time before completing a U-turn and then following the vehicle.

10:02:26   22      Q.   All right.   How long do you follow the vehicle?

10:02:29   23      A.   Distance-wise or time-wise?

10:02:33   24      Q.   Both.

10:02:33   25      A.   I would say about a mile, and over the course of a

8-2-16  USA v. REYES No. 15-10119

53

10:02:40  1   minute, maybe a little bit longer.  Less than five minutes for

10:02:44  2   sure.

10:02:47  3       Q.  Can you describe the route that you all took when you

10:02:51  4   followed this vehicle.

10:02:52  5       A.  Yes, I can.  On Eleventh Street, the Saturn stopped at

10:02:58  6   a stop sign at Eleventh and Bitting, and then continued west on

10:03:03  7   Eleventh.  We did the same.  And the Eleventh Street curves

10:03:06  8   around the north side of Riverside Park and then ends up

10:03:11  9   intersecting with streets just east of Simms golf course.  One

10:03:15  10  of those streets was Perry.  At the stop sign at Perry, the

10:03:19  11  vehicle ended up turning back northbound onto Perry.

10:03:22  12      Q.  When you say "northbound," just so we're all on the

10:03:24  13  same page, that would be right; is that correct?

10:03:26  14      A.  Correct, a right-hand turn.

10:03:28  15      Q.  Thank you.  How far behind the vehicle do you estimate

10:03:32  16  you were?

10:03:34  17      A.  I would estimate we were about one or two blocks behind

10:03:37  18  the vehicle.  We weren't right on its tail, but we were the

10:03:43  19  only car between -- you know, there was no cars between us and

10:03:47  20  the Saturn.

10:03:48  21      Q.  All right.  At any point throughout the time that you

10:03:52  22  all saw the vehicle drive by and this stop, was there ever any

10:03:57  23  vehicles between you and the Saturn Vue?

10:03:59  24      A.  No.

10:04:00  25      Q.  Did you ever lose sight of this vehicle?

8-2-16   USA v. REYES No. 15-10119

54

10:04:02   1      A.   I vaguely remember losing sight of it for a little --

10:04:06   2    for a short period of time 'cause I believe Eleventh Street

10:04:09   3    curves back to the north, which kind of would curve to the

10:04:13   4    right, and as it was curving to the right I -- for some reason

10:04:17   5    I feel like we may have lost sight just for a second or two as

10:04:21   6    it made that curve through the park.

10:04:23   7      Q.   All right.  As you gained sight of it again, again, did

10:04:26   8    you see any other vehicles on the road?

10:04:27   9      A.   No.

10:04:31   10     Q.   As you're traveling west -- as you're traveling west on

10:04:37   11   Eleventh Street, approaching Perry, what do you observe the

10:04:40   12   vehicle in front of you -- what do you see with the vehicle in

10:04:44   13   front of you?

10:04:44   14     A.   As the Saturn is approaching Perry, at the intersection

10:04:50   15   of Eleventh and Perry, I observe it slightly drift off course,

10:04:54   16   kind of left of center, to get around a parked vehicle which

10:04:59   17   was parked on the north side of Eleventh Street, just east of

10:05:02   18   Perry.  As the vehicle gets back on its original route, in that

10:05:08   19   lane of travel, I then observed it activate its right blinker

10:05:11   20   as it was slowing down to stop at the stop sign at Eleventh and

10:05:14   21   Perry.

10:05:19   22     Q.   At that time were you able to make an estimation as to

10:05:23   23   how far away this vehicle was from the stop sign before it

10:05:28   24   turned on its signal?

10:05:29   25     A.   At the time it went around the vehicle, we were a block

| | |
|---|---|
| 10:05:32 | 1 |
| 10:05:38 | 2 |
| 10:05:43 | 3 |
| 10:05:47 | 4 |
| 10:05:51 | 5 |
| 10:05:55 | 6 |
| 10:05:58 | 7 |
| 10:06:02 | 8 |
| 10:06:05 | 9 |
| 10:06:07 | 10 |

1  or two away, and so I estimated that it was definitely under a

2  hundred feet.  However, the way I measure distance is I pick a

3  landmark around where I observe something happen, and then I

4  measure that landmark.  So on this particular incident, the

5  landmark that I was measuring from in my mind was that parked

6  vehicle, because I knew that the Saturn had gone around the

7  parked vehicle before activating its blinker, so whenever we

8  got to where we were parallel with the parked vehicle, I

9  estimated the front of that parked vehicle to be approximately

10  50 feet from the intersection.

11  Q.  All right.  Did you believe that the vehicle had

12  engaged in a traffic violation?

13  A.  Yes, I did.

14  Q.  What traffic violation was that?

15  A.  It was failure to signal within a hundred -- or

16  within -- or over a hundred feet from its turn.

17  Q.  Is that stop at Perry and Eleventh, is that a two-way

18  stop or a four-way stop?

19  A.  I believe it's a two-way stop in which Eleventh Street

20  has the stop sign and Perry has the right-of-way.

21  Q.  All right.  So what occurs next?

22  A.  The vehicle continues north on Perry.  As it completes

23  its turn, we then get up to the intersection as we start to

24  speed up to catch the vehicle.  By the time we're catching the

25  vehicle, the Saturn is in the 1300 block of Perry, and we

10:06:56   1   activate our lights to try to get the vehicle to stop before it

10:07:00   2   reaches Thirteenth Street, so we're not in traffic.

10:07:03   3       Q.   All right.  What occurs?

10:07:06   4       A.   The Saturn slows down, as if to pull over, but

10:07:11   5   continues up to the stop sign at Thirteenth and Perry, comes to

10:07:14   6   a stop.  I exit the passenger side of the patrol car, thinking

10:07:19   7   that the vehicle had stopped for us.  Then the vehicle slowly

10:07:25   8   makes a right-hand turn back towards eastbound Thirteenth.  I

10:07:31   9   get back in the patrol car, not sure if the vehicle's going to

10:07:35   10  flee or just looking for a better spot to stop.  The Saturn

10:07:40   11  then continues east slowly, doesn't stop, and then turns into

10:07:46   12  the private drive, which is a business parking lot in the

10:07:49   13  southeast corner of Thirteenth and Perry.  The vehicle slowly

10:07:55   14  inches forward before finally coming to a stop.

10:07:57   15      Q.   All right.  What do you do at that time?

10:07:59   16      A.   I exit the passenger side of the patrol car and

10:08:02   17  approached the passenger side of the Saturn Vue.

10:08:07   18      Q.   What is your role at this point in time -- well, what

10:08:13   19  is your role?

10:08:14   20      A.   At that point I'm more of a cover officer.  Generally,

10:08:17   21  on traffic stops the driver of the patrol car, if there is a

10:08:20   22  two-officer unit, contacts the driver of the vehicle that made

10:08:27   23  the traffic infraction and the second officer either contacts

10:08:30   24  passengers, if there are passengers, or just maintains a safe

10:08:34   25  area to keep people from coming up, looking for weapons,

10:08:36  1   illegal items in the vehicle, anything that can harm us or

10:08:41  2   anything we might see that's illegal.

10:08:43  3       Q.   What occurred at this point?  You're out of the

10:08:45  4   vehicle.  You're approaching the passenger side.

10:08:46  5       A.   I -- as I walk up, I observe that there's only one

10:08:49  6   occupant in the car.  He's a Hispanic male.  And as I get to

10:08:53  7   the front passenger window, he's looking over at me.  I then

10:08:58  8   think I recognize him, as he looked similar to somebody that I

10:09:02  9   had previously dealt with; however, the window was up and I

10:09:04  10  couldn't communicate with him.  And then Officer Hornberger,

10:09:07  11  who is approaching the driver's side of the car, contacts the

10:09:10  12  driver.

10:09:10  13      Q.   All right.  Who did you think he was?

10:09:13  14      A.   At that point I thought he was an individual by the

10:09:15  15  name of Cesar Reyes.

10:09:16  16      Q.   All right.  Had you dealt with Cesar before in your

10:09:21  17  role as a police officer?

10:09:22  18      A.   Yes, I had.

10:09:26  19      Q.   You're not able to communicate or speak with the driver

10:09:29  20  because the window's up.  Can you at this point see into the

10:09:31  21  vehicle, or do you even attempt to look into the vehicle yet?

10:09:34  22      A.   Yes, I can see in the vehicle.

10:09:35  23      Q.   All right.  What do you observe?

10:09:37  24      A.   I observed just the single occupant.  I observe several

10:09:41  25  items in and around the driver.  I don't immediately observe

10:09:45  1   any weapons or illegal items at that time.

10:09:54  2       Q.   Then what happens?

10:09:56  3       A.   Officer Hornberger makes contact with the driver.  I

10:09:59  4   can hear them speaking.  And then I observe the driver get out

10:10:03  5   of the vehicle, at that point I believe it was upon Officer

10:10:08  6   Hornberger's request, and then I walk over around the vehicle

10:10:11  7   to assist Officer Hornberger.

10:10:13  8       Q.   All right.  Did he ask for your assistance or is that

10:10:18  9   just standard?

10:10:18  10      A.   It's standard for me, any time somebody's asked out of

10:10:22  11  the vehicle, in case they're being arrested, I come over to

10:10:25  12  assist.  Based on our training we know, and my experience, it's

10:10:30  13  common for individuals that are going to flee or fight, that

10:10:35  14  usually happens when we first have to put hands on them, either

10:10:38  15  to put handcuffs on them or to restrain them.

10:10:41  16      Q.   All right.  And what occurred as you walked around the

10:10:43  17  vehicle?

10:10:43  18      A.   As I walked around the vehicle, I could hear Officer

10:10:47  19  Hornberger telling the driver to calm down and relax.  At that

10:10:51  20  point I walk up and get right next to them, and Officer

10:10:56  21  Hornberger is holding the driver's hands, and he requests that

10:10:59  22  I put handcuffs on him because he was trying to reach for

10:11:03  23  something.

10:11:03  24      Q.   All right.  And what did you do?

10:11:05  25      A.   I pulled my handcuffs out and placed them on the driver

10:11:09  1    behind his back.

10:11:09  2        Q.   All right.  What did you do next?

10:11:11  3        A.   The car was still on and it was dinging, as if the --

10:11:19  4    it was either running or the lights were on, and so I asked the

10:11:23  5    driver if I could shut the car off, to keep the battery from

10:11:25  6    dying, and he said that I could.  So I reached in and turned

10:11:28  7    the key off and put the key on the seat.

10:11:31  8        Q.   Did you do any kind of search at that point?

10:11:34  9        A.   No.  Officer -- I had heard Officer Hornberger ask the

10:11:38 10    driver if we could search the car, and he said that we

10:11:42 11    couldn't, and that he wasn't the owner of the car, and so I

10:11:47 12    requested a K-9 to assist us on our stop.

10:11:48 13        Q.   How did you request a K-9?

10:11:51 14        A.   Over the radio.  I have a radio here on my uniform,

10:11:55 15    similar to the uniform I was wearing that night, and I just

10:11:58 16    activated it and asked for dispatch to start us a K-9 unit.

10:12:02 17        Q.   Prior to radioing -- or maybe it was after.  At some

10:12:08 18    point did you make a statement to Mr. Reyes as to why you were

10:12:14 19    calling a K-9?

10:12:15 20        A.   Afterwards he had requested, after officer -- after the

10:12:22 21    handcuffs were placed on the driver, he was walked back to our

10:12:26 22    patrol car, which was behind the Saturn, and he asked if he

10:12:30 23    could release the vehicle or if he could call his girlfriend to

10:12:33 24    come get the car, which in my experience is very odd for

10:12:37 25    someone to ask that just after being placed in handcuffs.  And

10:12:42  1   so I made the statement that he was -- that he seemed to be

10:12:45  2   pretty -- he wanted to get the car out of there pretty fast,

10:12:51  3   and that I said that I had believed that there was some

10:12:54  4   possibly some illegal items in that car.

10:12:56  5        Q.   Did you ask him any questions?

10:12:58  6        A.   No.

10:12:59  7        Q.   Did you ask him what was in the vehicle?

10:13:01  8        A.   No.

10:13:01  9        Q.   Did you ask him what was illegal in the vehicle?

10:13:04  10       A.   No.

10:13:05  11       Q.   All right.  So this was a statement that you made in

10:13:07  12  response to his question then?

10:13:09  13       A.   Yes.  It was something to the effect of, "You seem

10:13:12  14  pretty nervous about getting the car out of there.  Makes me

10:13:15  15  think that there's something illegal in the car."

10:13:17  16       Q.   All right.  What did -- and you had already called for

10:13:21  17  a K-9 at this point?

10:13:22  18       A.   Yes, I had requested the K-9 prior to -- I believe it

10:13:26  19  was prior to him asking to release the car.

10:13:29  20       Q.   All right.  What occurred then?

10:13:31  21       A.   The driver said that, after I said that "You seem

10:13:36  22  pretty nervous and that there might be something illegal in the

10:13:38  23  car," he said that there's just a blunt on the passenger side

10:13:42  24  floorboard.

10:13:43  25       Q.   What did you believe him to mean by the word "blunt"?

8-2-16   USA v. REYES No. 15-10119

61

| | | |
|---|---|---|
| 10:13:48 | 1 | A.   In my experience in investigating drug complaints, I |
| 10:13:53 | 2 | know that blunt is commonly referred to as a marijuana |
| 10:13:56 | 3 | cigarette.   At that point when he said "blunt," I immediately |
| 10:14:01 | 4 | believed him to be speaking about a marijuana cigarette. |
| 10:14:04 | 5 | Q.   All right.   What did you do? |
| 10:14:05 | 6 | A.   I walked to the passenger side of the car, which the |
| 10:14:09 | 7 | window was still up and the door was still shut.   I then shined |
| 10:14:12 | 8 | my flashlight from the outside onto the passenger side |
| 10:14:15 | 9 | floorboard, and observed an approximately 2-inch-long, brown, |
| 10:14:20 | 10 | rolled cigarette that had a green botanical substance inside of |
| 10:14:22 | 11 | it resembling marijuana. |
| 10:14:24 | 12 | Q.   What did you do once you observed this marijuana on the |
| 10:14:28 | 13 | floor of the passenger side floorboard? |
| 10:14:30 | 14 | A.   I then got in the car to examine it further, and then |
| 10:14:35 | 15 | did confirm that it did appear to be marijuana. |
| 10:14:39 | 16 | Q.   All right.   After you located the marijuana, did you |
| 10:14:44 | 17 | then search the remainder of the vehicle? |
| 10:14:46 | 18 | A.   Yes, I did. |
| 10:14:47 | 19 | Q.   What items did you find inside the vehicle? |
| 10:14:49 | 20 | A.   If I can refer to my report to be more accurate. |
| 10:14:52 | 21 | Q.   Yes, as long as I can ask you a few questions first. |
| 10:14:54 | 22 | A.   Yes. |
| 10:14:54 | 23 | Q.   Is it standard for you to write a report after an |
| 10:14:57 | 24 | arrest is made? |
| 10:14:58 | 25 | A.   Yes, it is. |

| | | |
|---|---|---|
| 10:14:59 | 1 | Q.   How do you make that report? |
| 10:15:01 | 2 | **A.   We have a couple of different ways we can do it.  We** |
| 10:15:05 | 3 | **can either call it in on a phone, which is like a voicemail or** |
| 10:15:11 | 4 | **an answering machine service where we just speak and then a** |
| 10:15:15 | 5 | **transcriptionist types it out later, or we can physically type** |
| 10:15:19 | 6 | **our reports on a word-processor program and then submit them to** |
| 10:15:24 | 7 | **be entered.** |
| 10:15:24 | 8 | Q.   Do you recall how it was done on this occasion? |
| 10:15:27 | 9 | **A.   If I can refer to the report, I can probably tell you** |
| 10:15:30 | 10 | **that.** |
| 10:15:30 | 11 | Q.   All right.  Well, so I'll go back to that question.  So |
| 10:15:33 | 12 | before you do this, since you have either called in this report |
| 10:15:36 | 13 | or written this report, have you had an opportunity to review |
| 10:15:39 | 14 | it? |
| 10:15:39 | 15 | **A.   Yes, I have.** |
| 10:15:39 | 16 | Q.   Is it a clear and accurate depiction of the events that |
| 10:15:44 | 17 | occurred on that night? |
| 10:15:45 | 18 | **A.   Yes.** |
| 10:15:46 | 19 | Q.   Have you made any kind of corrections or are there any |
| 10:15:48 | 20 | corrections that need to be made to this report? |
| 10:15:50 | 21 | **A.   Yes, there is.** |
| 10:15:50 | 22 | Q.   And what are those corrections? |
| 10:15:52 | 23 | **A.   On the first page, I -- in the first paragraph, my -- I** |
| 10:16:00 | 24 | **don't know what number sentence it is, but I stated in my** |
| 10:16:02 | 25 | **report that the Saturn turned west onto Thirteenth Street, when** |

10:16:06   1   **it actually turned east onto Thirteenth Street.  And then in**

10:16:09   2   **the paragraph -- or the sentence right after it, I say that the**

10:16:11   3   **Saturn turned -- or I'm sorry, yeah, the Saturn turned west on**

10:16:16   4   **Thirteenth, which should be east on Thirteenth.**

10:16:18   5       Q.   Okay.

10:16:18   6       **A.   That was the error that I found.**

10:16:20   7       Q.   All right.  At this point if you'll look at your report

10:16:23   8   and let us know whether or not you typed it yourself or whether

10:16:26   9   or not it was typed for you.

10:16:28  10       **A.   Yes, I did type it myself.  The last page of my report**

10:16:31  11   **has my name and initials.  And my assignment, generally when a**

10:16:37  12   **report is called in over the phone on the answering machine**

10:16:40  13   **service, it will have the transcriptionist's initials and ID**

10:16:44  14   **number, and this does not, which indicates to me that I typed**

10:16:46  15   **this report myself.**

10:16:47  16       Q.   All right.

10:16:48  17              MS. JACOBS:  Your Honor, may he use his report to

10:16:50  18   refresh his memory?

10:16:52  19              THE COURT:  He may.

10:16:52  20              MS. JACOBS:  Thank you.

10:16:53  21   BY MS. JACOBS:

10:16:53  22       Q.   So I think my question, before I asked you a lot of

10:16:55  23   other ones, were what items did you locate inside the vehicle.

10:17:00  24       **A.   I located a black glass marijuana pipe in the center**

10:17:07  25   **console, a black digital scale in the driver's side door**

10:17:12  1    pocket.  I located cash and a color copy of the Social Security

10:17:17  2    card in the -- by the gear shifter under the radio.  I located

10:17:24  3    a Marlboro pack of cigarettes in the drop-down sunglass case on

10:17:31  4    the roof of the Saturn, and inside that cigarette pack I

10:17:34  5    located two bags of crystalline substance resembling

10:17:39  6    methamphetamine.  I also located a backpack directly behind the

10:17:44  7    driver's seat that contained men's clothing, a gray digital

10:17:50  8    scale, two firearms, a letter, and a pill bottle.

10:17:55  9    Q.  Okay.  All of these items were collected by you; is

10:17:59  10   that a correct statement?

10:18:00  11   A.  Yes.

10:18:00  12   Q.  They were submitted to evidence at a later time?

10:18:02  13   A.  Yes.

10:18:03  14   Q.  And I say "later time."  Later that night, I think,

10:18:06  15   would be an accurate statement?

10:18:07  16   A.  Before the end of my shift, yes.

10:18:09  17   Q.  As part of your duties as collecting the evidence from

10:18:13  18   this vehicle, did you also take photographs?

10:18:15  19   A.  Yes, I did.

10:18:17  20   Q.  Can you describe to the Court just the device that you

10:18:19  21   used to take the photographs.

10:18:21  22   A.  I used a digital camera that is owned by the City of

10:18:24  23   Wichita, and then uploaded them to a digital photography

10:18:28  24   folder, which is then put into our records system.

10:18:32  25   Q.  All right.  Were you responsible for turning that

10:18:34  1    information over to the United States, or does somebody else, a

10:18:38  2    detective or some other investigator, do that?

10:18:40  3        A.   Detective Paul Herman does that.

10:18:44  4        Q.   Have you had an opportunity, since you took those

10:18:48  5    photographs back in May of 2015, to review those photographs?

10:18:51  6        A.   Yes, I have.

10:18:52  7        Q.   Would you agree -- or is it your statement that those

10:18:56  8    photographs are clear and accurate representations of the items

10:18:59  9    that you collected that night and what you observed?

10:19:02  10       A.   Some are clearer than others, but yes.

10:19:04  11       Q.   That would have to do with the photography skills;

10:19:07  12   would that be an accurate --

10:19:09  13       A.   Yes.

10:19:09  14       Q.   And any changes that you observed in those photographs?

10:19:12  15       A.   No.

10:19:17  16       Q.   At this time I'm going to hand you a series of four

10:19:20  17   photographs.  These have already been provided to the Court.

10:19:23  18   Without -- before I publish it, would you go ahead and observe

10:19:27  19   photograph 1.  Do you recognize this photograph?

10:19:31  20       A.   Yes, I do.

10:19:32  21       Q.   And, again, is this a photograph that you took?

10:19:34  22       A.   Yes, it appears to be.

10:19:35  23       Q.   An accurate representation of the photograph that you

10:19:38  24   took on May 29th of 2015?

10:19:41  25       A.   Yes.

10:19:41  1      Q.   And, again, let's just go ahead and flip through

10:19:44  2  photograph 2, 3, and 4, and all of these photographs appear to

10:19:48  3  be clear and accurate representations of photographs that you

10:19:51  4  took on May -- I've already forgotten -- May 29th of 2015?

10:19:58  5      A.   Yes.

10:19:59  6      Q.   Any changes or deletions made in any of these

10:20:02  7  photographs?

10:20:03  8      A.   No.

10:20:04  9           MS. JACOBS:  Your Honor, at this time the

10:20:05  10  Government would move for admission of Exhibit 1, 2, 3, and 4.

10:20:11  11           THE COURT:  Mr. Sevart?

10:20:12  12           MR. SEVART:  Your Honor, for the purposes of this

10:20:14  13  hearing, no objection.

10:20:15  14           THE COURT:  These photos will be admitted for

10:20:17  15  purposes of this hearing.

10:20:19  16           MS. JACOBS:  Thank you.

10:20:20  17  BY MS. JACOBS:

10:20:20  18      Q.   I'm going to go ahead and publish the first photograph.

10:20:24  19  You may see it on the screen but I know it's also sitting in

10:20:27  20  front of you.  Can you tell the Court what this is a photograph

10:20:30  21  of?

10:20:30  22      A.   **This is a photograph of the rear of the Saturn Vue that**

10:20:32  23  **we stopped May 29th at Thirteenth and Perry.**

10:20:34  24      Q.   All right.  This is taken from, obviously, behind the

10:20:39  25  vehicle, in front of the patrol car; is that correct?

10:20:42   1      A.   Yes.

10:20:42   2      Q.   So the lighting -- would you talk a little about the

10:20:45   3   talking in this area for the Court.

10:20:47   4      A.   **The lighting is actually a little brighter than what**

10:20:52   5   **this photo makes it out because of our patrol car.  You can see**

10:20:56   6   **the reflection in the rear of the Saturn that our headlights**

10:20:59   7   **were on, which deactivates the automatic flash on our vehicle.**

10:21:03   8   **So as you can see, along Thirteenth, which is to the right of**

10:21:08   9   **the Saturn, there are streetlights that are operating properly,**

10:21:16  10   **and this area is more well lit than further south, which is**

10:21:21  11   **more residential.**

10:21:22  12      Q.   All right.  And then photograph 2, our Government's

10:21:29  13   Exhibit 2, I guess, would be a better, more accurate,

10:21:33  14   statement, would you describe this for the Court, please.

10:21:38  15      A.   **This is a photograph of the driver's compartment from**

10:21:43  16   **outside of the vehicle, looking in through the open driver's --**

10:21:47  17   **front driver's side door.**

10:21:48  18      Q.   And will you go ahead and tell the Court what's on the

10:21:52  19   front seat of this vehicle.

10:21:53  20      A.   **Those are the keys to the vehicle that I had removed**

10:21:55  21   **from the ignition upon the driver's request to keep the battery**

10:21:59  22   **from dying.**

10:22:00  23      Q.   All right.  And you -- where did you place them when

10:22:03  24   you were finished with them or when you took them out of the

10:22:05  25   ignition?

| | | |
|---|---|---|
| 10:22:06 | 1 | **A.   I placed them there on the seat.** |
| 10:22:07 | 2 | Q.   All right.  And, again, when you reached into this |
| 10:22:10 | 3 | vehicle to turn it off, did you do any kind of search of the |
| 10:22:13 | 4 | vehicle at that time? |
| 10:22:13 | 5 | **A.   No.** |
| 10:22:19 | 6 | Q.   And would you describe to the Court what is in |
| 10:22:22 | 7 | Government's Exhibit 3. |
| 10:22:24 | 8 | **A.   This is a photograph from the front passenger -- or** |
| 10:22:28 | 9 | **from outside of the vehicle looking into the front passenger** |
| 10:22:31 | 10 | **compartment of the vehicle, mainly towards the floorboard.** |
| 10:22:35 | 11 | Q.   All right.  You stated that, after you -- after |
| 10:22:39 | 12 | Mr. Reyes stated there was a blunt in the front seat, you |
| 10:22:42 | 13 | approached the vehicle.  Did you open the door initially or did |
| 10:22:45 | 14 | you just shine the flashlight? |
| 10:22:46 | 15 | **A.   I just shined my flashlight through the window.** |
| 10:22:50 | 16 | Q.   All right.  And by shining of your flashlight through |
| 10:22:54 | 17 | the window and looking down, were you able to observe anything |
| 10:22:59 | 18 | illegal at that time? |
| 10:22:59 | 19 | **A.   Yes, I did.** |
| 10:23:00 | 20 | Q.   And can you -- |
| 10:23:03 | 21 |             MS. JACOBS:  Is his screen on? |
| 10:23:03 | 22 | BY MS. JACOBS: |
| 10:23:04 | 23 | Q.   Can you circle on your screen what exactly it is that |
| 10:23:08 | 24 | you -- maybe what you observed that you believed was illegal at |
| 10:23:11 | 25 | that time. |

| | | |
|---|---|---|
| 10:23:11 | 1 | **A.   I can.   (Indicating).** |
| 10:23:15 | 2 | Q.   And what did you believe that was? |
| 10:23:17 | 3 | **A.   The marijuana cigarette that the driver referred to as** |
| 10:23:22 | 4 | **a blunt.** |
| 10:23:23 | 5 | Q.   And then after you opened the vehicle, you were able to |
| 10:23:27 | 6 | get a better view and a better picture of it; is that correct? |
| 10:23:30 | 7 | **A.   Yes, ma'am.** |
| 10:23:31 | 8 | Q.   So the last Government's photo, Government's Exhibit |
| 10:23:38 | 9 | photograph 4, I'll circle it for you, is that a closer picture |
| 10:23:42 | 10 | of the marijuana blunt? |
| 10:23:44 | 11 | **A.   Yes.** |
| 10:23:45 | 12 | Q.   And that was, again, after he had already told you |
| 10:23:47 | 13 | about it, and that was after you had already searched the |
| 10:23:49 | 14 | vehicle; is that correct? |
| 10:23:52 | 15 | **A.   This photograph was after I had opened the car door to** |
| 10:23:55 | 16 | **examine it further.** |
| 10:24:12 | 17 | MS. JACOBS:  Your Honor, I have no further |
| 10:24:13 | 18 | questions at this time. |
| 10:24:14 | 19 | THE COURT:  Thank you.  Cross-examination, |
| 10:24:16 | 20 | Mr. Sevart. |
| 10:24:17 | 21 | CROSS-EXAMINATION |
| 10:24:18 | 22 | BY MR. SEVART: |
| 10:24:27 | 23 | Q.   Officer, you doing okay?  You need a break or anything? |
| 10:24:29 | 24 | **A.   I'm okay.   Thank you.** |
| 10:24:31 | 25 | Q.   Thanks.  With respect to your job duties that night, |

10:24:39    1    you guys were not on traffic patrol; correct?

10:24:42    2        A.    Correct.

10:24:44    3        Q.    You were -- your intent was, when you saw this car

10:24:49    4    parked in the parking lot or in that driveway, your intent was

10:24:54    5    to get inside of that vehicle and do a search; correct?

10:24:58    6        A.    **No, our intent was to investigate the possibility of**

10:25:01    7    **drug activity.**

10:25:03    8        Q.    But to do that, you got to get inside the vehicle;

10:25:06    9    correct?

10:25:06   10        A.    **Not necessarily.    There are several stops where**

10:25:10   11    **intelligence is gathered just by speaking to someone.**

10:25:14   12        Q.    Well, those are other cases.  I'm talking about this

10:25:16   13    case.  Okay?  And if you didn't want to get in the vehicle, you

10:25:23   14    would agree, would you not, there's no need to sit off the

10:25:27   15    vehicle?

10:25:27   16        A.    **Not necessarily.**

10:25:28   17        Q.    Well, I guess if your intent was not to get inside of

10:25:38   18    the car, then what intent would you have sitting the car off?

10:25:42   19        A.    **The first intent is to, like I said, either -- mainly**

10:25:49   20    **to investigate that complaint.    In my experience in working**

10:25:53   21    **neighborhood complaints, there's several times that there is**

10:25:57   22    **legitimate activity at a suspected narcotics house, such as**

10:26:01   23    **family coming over to visit.    In those instances in which I**

10:26:05   24    **have stopped individuals for traffic infractions leaving**

10:26:08   25    **complaint houses, and through my, I guess, through verbal**

10:26:13   1   **skills in talking to people after -- during the course of a**

10:26:17   2   **traffic stop, travel plans, things of that nature, there are**

10:26:20   3   **times where it is not of any interest of mine to get into that**

10:26:25   4   **car.  So at the time of observing that car --**

10:26:29   5        Q.   Right.  Let me stop you just for a moment.

10:26:31   6        **A.   -- it was not my intent to get into that car.**

10:26:33   7        Q.   Let me stop you just for a moment, because you're kind

10:26:36   8   of prefacing that on what you learn after a stop; right?  But

10:26:39   9   I'm talking about before you ever stop a car, your intent is to

10:26:45   10  figure out how to stop that car and get inside of it; correct?

10:26:48   11       **A.   Not necessarily, no.**

10:26:49   12       Q.   Well, "not necessarily" suggests that there are times

10:26:51   13  when that is your intent; correct?

10:26:53   14       **A.   Whenever the investigation and speaking to people about**

10:26:59   15  **their business at that location leads me to believe that there**

10:27:02   16  **is, in fact, narcotic activity, yes, that would be the initial**

10:27:08   17  **intent or the end goal, as I would say.**

10:27:10   18       Q.   Right.  I guess I'm just seeking an admission from you

10:27:14   19  that on this particular night and on this particular event you

10:27:19   20  wanted to get inside of that vehicle.

10:27:20   21       **A.   Not when I first saw it.**

10:27:22   22       Q.   Well, then why would you stop and just watch it?

10:27:25   23       **A.   To, like I said, investigate to --**

10:27:25   24       Q.   How do you --

10:27:28   25       **A.   -- gather more information.**

10:27:28   1       Q.   Okay.  And how do you --

10:27:30   2              THE COURT:  Counsel, the court reporter will be a

10:27:31   3   lot happier if only one of you talk at a time.

10:27:34   4              MR. SEVART:  I apologize.

10:27:35   5              THE COURT:  And if the court reporter's unhappy,

10:27:36   6   then I'm unhappy.

10:27:37   7              MR. SEVART:  Yes, Your Honor.  I'll try to direct

10:27:41   8   my question a little bit more to you so that we don't ramble

10:27:45   9   on.

10:27:46   10  BY MR. SEVART:

10:27:46   11      Q.   You understand what I'm asking you; right?

10:27:48   12      **A.   Yes, I do.**

10:27:48   13      Q.   I'm trying to get you to admit that you guys wanted to

10:27:52   14  get inside that vehicle; correct?

10:27:54   15      **A.   Right.**

10:27:54   16      Q.   'Cause that's what your job was that night?

10:27:57   17      **A.   No.**

10:27:57   18      Q.   Okay.  And you want to stick with that?

10:28:00   19      **A.   Yes.**

10:28:00   20      Q.   Okay.  So you're not willing to even admit that?

10:28:06   21      **A.   Our job was to investigate that neighborhood complaint,**

10:28:09   22  **which we were doing.**

10:28:10   23      Q.   Okay.  And as part of that investigation, you want to

10:28:14   24  get inside that car; correct?

10:28:15   25              THE COURT:  I think we can move on, Mr. Sevart.

10:28:17  1    And there's no jury here.

10:28:19  2                    MR. SEVART:  I understand.

10:28:19  3                    THE COURT:  I think we can move on.

10:28:21  4                    MR. SEVART:  Okay.  I appreciate it, Your Honor.

10:28:23  5    BY MR. SEVART:

10:28:23  6         Q.  Would you also agree that a K-9 unit in no way is going

10:28:28  7    to help investigate a turn signal stop; correct?

10:28:31  8         **A.  The turn signal part, I agree on.**

10:28:33  9         Q.  Okay.  So there's -- there's no need to delay somebody

10:28:40  10   on a turn signal violation to wait for a K-9 unit; correct?

10:28:46  11        **A.  I guess I don't understand what you're asking.  If**

10:28:49  12   **you're asking about this particular incident, the driver of the**

10:28:52  13   **vehicle was under arrest at the time of the stop.**

10:28:58  14        Q.  A K-9 unit also does not assist with any sort of a

10:29:03  15   driving-while-suspended violation; correct?

10:29:06  16        **A.  Not to my knowledge.**

10:29:12  17        Q.  Your statement about there must be something in the car

10:29:20  18   or dealing with why he would refuse to search, you recall that

10:29:24  19   testimony?

10:29:25  20        **A.  Yes, I do.**

10:29:25  21        Q.  You would agree, would you not, that that conversation

10:29:30  22   with my client occurred before there was ever any discussion of

10:29:33  23   *Miranda*; correct?

10:29:34  24        **A.  I would agree that, yes.**

10:29:36  25        Q.  Okay.  And you also would agree that your statement to

| | | |
|---|---|---|
| 10:29:42 | 1 | him was accusatory in nature; correct? |
| 10:29:48 | 2 | **A.  It could be seen that way, yes.** |
| 10:29:49 | 3 | Q.  Okay.  And generally an accusatory statement is made in |
| 10:29:55 | 4 | an effort to kind of get an accusatory response back; correct? |
| 10:30:01 | 5 | **A.  No, not necessarily.** |
| 10:30:04 | 6 | Q.  Okay.  Again, you're using "not necessarily," so that |
| 10:30:07 | 7 | would assume then that, well, there are times when it does. |
| 10:30:10 | 8 | Correct? |
| 10:30:11 | 9 | **A.  There have been times, yes.** |
| 10:30:12 | 10 | Q.  Okay.  You didn't have to say anything to him, did you? |
| 10:30:18 | 11 | **A.  Correct.** |
| 10:30:20 | 12 | Q.  You're trained about using caution when visiting with |
| 10:30:25 | 13 | somebody who is under arrest before giving any *Miranda*; |
| 10:30:29 | 14 | correct? |
| 10:30:30 | 15 | **A.  You say that I'm cautioned about that?** |
| 10:30:32 | 16 | Q.  Uh-huh. |
| 10:30:34 | 17 | **A.  We are trained to -- that any time an individual's in** |
| 10:30:39 | 18 | **custody and we are going to interrogate that individual, that** |
| 10:30:43 | 19 | ***Miranda* must be given.** |
| 10:30:44 | 20 | Q.  And so you knew good and well that he was in custody; |
| 10:30:47 | 21 | correct? |
| 10:30:47 | 22 | **A.  Yes, I did.** |
| 10:30:47 | 23 | Q.  And you certainly have a *Miranda* card with you; |
| 10:30:50 | 24 | correct? |
| 10:30:50 | 25 | **A.  Yes, I did.** |

8-2-16   USA v. REYES No. 15-10119

75

10:30:50  1    Q.   But you didn't use that before directing any

10:30:54  2    conversation toward him, did you?

10:30:55  3    **A.   Not when I made that statement, no.**

10:31:01  4    Q.   Also, we covered this more with the other officer and

10:31:04  5    don't need to rehash it all, but you're dressed the same way he

10:31:08  6    is; correct?

10:31:09  7    **A.   Yes.**

10:31:09  8    Q.   And you're a member of the same task force that he is;

10:31:13  9    correct?

10:31:14  10   **A.   Yes.**

10:31:14  11   Q.   And the same style of policing that he is; correct?

10:31:18  12   **A.   I would say that our styles are somewhat different, but**

10:31:22  13   **the same sort of team that investigates neighborhood**

10:31:26  14   **complaints.**

10:31:26  15   Q.   And you would agree that you had no warrant or

10:31:31  16   permission from a magistrate or a district court judge of any

10:31:36  17   federal or state to sit off the house; correct?

10:31:41  18   **A.   Correct.**

10:31:42  19   Q.   You had no warrant or permission from any magistrate to

10:31:47  20   trail the vehicle; correct?

10:31:49  21   **A.   I had no warrant.**

10:31:52  22   Q.   Or permission to, you know, like a tracer or any sort

10:31:56  23   of a mechanism to follow the vehicle; correct?

10:31:58  24   **A.   I did not have those items.**

10:32:00  25   Q.   Okay.  And you also never obtained any permission via

8-2-16   USA v. REYES No. 15-10119

| | | |
|---|---|---|
| 10:32:05 | 1 | warrant or otherwise to search the vehicle; correct? |
| 10:32:08 | 2 | **A.   We had no warrant, correct.** |
| 10:32:11 | 3 | Q.   And you had no permission from a supervisor; correct? |
| 10:32:14 | 4 | **A.   We did not.** |
| 10:32:14 | 5 | Q.   And you had no permission from my client; correct? |
| 10:32:18 | 6 | **A.   That is correct.** |
| 10:32:18 | 7 | Q.   In fact, he told you that you had no permission to be |
| 10:32:22 | 8 | in there; correct? |
| 10:32:22 | 9 | **A.   That is correct.** |
| 10:32:33 | 10 | Q.   You also had a camera with you that night; correct? |
| 10:32:36 | 11 | **A.   A digital camera that I used to take the photographs,** |
| 10:32:38 | 12 | **yes.** |
| 10:32:39 | 13 | Q.   But you didn't take any photographs back where |
| 10:32:41 | 14 | allegedly the stop or the traffic violation occurred; correct? |
| 10:32:45 | 15 | **A.   No, I did not.** |
| 10:32:46 | 16 | Q.   And so we -- we don't have anything to verify you and |
| 10:32:53 | 17 | your partner's statement about this turn signal violation; |
| 10:32:57 | 18 | correct? |
| 10:32:58 | 19 | **A.   There are no photographs.** |
| 10:33:00 | 20 | Q.   And there's no video of that either, is there? |
| 10:33:03 | 21 | **A.   I don't believe so.** |
| 10:33:04 | 22 | Q.   And you estimate this turn signal being used at about |
| 10:33:08 | 23 | 50 feet? |
| 10:33:09 | 24 | **A.   Yes.** |
| 10:33:09 | 25 | Q.   Do you realize your partner's saying it's about 20 |

10:33:12  1  feet?

10:33:12  2     A.  I do.

10:33:13  3     Q.  So you realize that, obviously, you guys aren't on the

10:33:20  4  same page as far as distance; correct?

10:33:23  5     **A.  I realize that we estimate distance differently and his**

10:33:27  6  **estimation that night was slightly different than mine.**

10:33:29  7     Q.  Okay.  So you're wanting to use -- you're wanting the

10:33:31  8  Court to strictly construe a-hundred-feet statute; correct?

10:33:36  9     **A.  I guess I don't understand what that question is.**

10:33:38  10     Q.  Well, the turn signal statute really is a safety

10:33:42  11  statute; correct?

10:33:43  12     **A.  It's -- I believe the statute says that the vehicle**

10:33:47  13  **must signal a hundred feet or earlier before completing the**

10:33:51  14  **turn.**

10:33:51  15     Q.  Well, there's some language in that, but the intent of

10:33:55  16  the statute is a safety statute; correct?

10:33:56  17     **A.  I can't testify to that.**

10:33:57  18     Q.  Well, aren't you trained in the academy about the

10:34:00  19  intent behind traffic laws?

10:34:03  20     **A.  Not necessarily.  There's several traffic laws, and in**

10:34:06  21  **each law we're not trained on what the intent of the**

10:34:09  22  **legislation was when it was deemed a law.**

10:34:12  23     Q.  How about did you ever -- were you ever a traffic

10:34:15  24  officer?

10:34:15  25     **A.  No.**

10:34:15   1    Q.   Did you take driver's education?

10:34:18   2    **A.   Yes, I did.**

10:34:19   3    Q.   And did you study the handbook with respect to getting

10:34:22   4    a driver's license?

10:34:22   5    **A.   Yes, I did.**

10:34:23   6    Q.   Okay.  Would you agree that a turn signal situation is

10:34:29   7    over in the safety category?

10:34:31   8    **A.   I don't remember where the turn signal section was.**

10:34:34   9    Q.   Okay.  Well, would you agree with this, that the

10:34:37   10   purpose of a turn signal is to let people know that you're

10:34:41   11   going to be turning?

10:34:42   12   **A.   Yes, I would.**

10:34:42   13   Q.   Okay.  And so it's really about advance notice;

10:34:46   14   correct?

10:34:47   15   **A.   Yes.**

10:34:47   16   Q.   And you guys were given advance notice that this car

10:34:52   17   was going to be turning; correct?

10:34:53   18   **A.   We were given, in my estimation, 50 feet of notice.**

10:34:57   19   Q.   Okay.  That's what I'm getting at, you're wanting the

10:35:00   20   judge to strictly construe this hundred feet requirement;

10:35:04   21   correct?

10:35:05   22   **A.   I guess I --**

10:35:07   23   Q.   But you're wanting him to do that off of speculation of

10:35:11   24   distances; correct?

10:35:12   25   **A.   I guess I don't understand what you're asking me.**

10:35:15   1      Q.   Okay.  You're all hung up on -- there's no question a

10:35:22   2   turn signal was used; right?

10:35:24   3      **A.   That is correct.**

10:35:24   4      Q.   You're in here wanting to split hairs and say, well,

10:35:27   5   but it wasn't used a hundred feet; correct?

10:35:29   6      **A.   I'm just answering the questions that are asked of me.**

10:35:33   7   **I can only testify.**

10:35:34   8      Q.   Well, you're making an allegation that he didn't use

10:35:36   9   his turn signal within a hundred feet; right?

10:35:39   10      **A.   That night he did not, correct.**

10:35:41   11      Q.   But you don't have any physical evidence for us to look

10:35:45   12   at, do we?

10:35:46   13      **A.   There are no photos or no videos of that intersection**

10:35:50   14   **that I'm aware of.**

10:35:51   15      Q.   And you didn't go out there and use a measuring tape to

10:35:54   16   see how far your estimation is, did you?

10:35:57   17      **A.   No, I've never done that in my career.**

10:35:59   18      Q.   In fact, you didn't even go over there and pace it off,

10:36:01   19   either foot by foot or yard by yard?  You didn't even step it

10:36:05   20   off, did you?

10:36:06   21      **A.   Again, I've never done that in my career.**

10:36:10   22      Q.   So you're just wanting us to agree with your

10:36:14   23   speculation of less than a hundred feet?  You're wanting us to

10:36:20   24   strictly construe a statute but not strictly require the proof;

10:36:25   25   is that accurate?

8-2-16   USA v. REYES No. 15-10119

10:36:27  1    **A.   Again, I guess I don't understand kind of what you're**

10:36:30  2    **asking me.  I can only testify to what I observed that night.**

10:36:33  3    Q.   Okay.  Well, let's talk about that then.  What we do

10:36:37  4    know is that you're a passenger in the car; correct?

10:36:40  5    **A.   Yes.**

10:36:40  6    Q.   Your partner, who gave the shorter distance, he's

10:36:43  7    driving; correct?

10:36:44  8    **A.   Yes, he is.**

10:36:45  9    Q.   I assume he's paying attention to how he's driving the

10:36:47  10   car?

10:36:48  11   **A.   I can't testify to what he's paying attention to.**

10:36:50  12   Q.   Well, he didn't crash the car, did he?

10:36:52  13   **A.   No, he did not.**

10:36:53  14   Q.   In fact, there was no accident or anything involved

10:36:56  15   with this turning, was there?

10:36:57  16   **A.   No.**

10:36:57  17   Q.   Okay.  There weren't even any other cars out on the

10:37:00  18   road other than the two of you guys?

10:37:01  19   **A.   And the parked car that I observed.**

10:37:03  20   Q.   Well, as far as moving vehicles.

10:37:04  21   **A.   Yes, I don't recall --**

10:37:06  22   Q.   You guys were a couple of blocks behind the car;

10:37:09  23   correct?

10:37:09  24   **A.   One or two blocks, I estimated.**

10:37:11  25   Q.   Okay.  So you weren't even -- really, there wasn't even

10:37:15  1   anybody around to give a warning about turn signal to; correct?

10:37:18  2       **A.   Other than us and that vehicle, I really didn't see any**

10:37:23  3   **other pedestrians or vehicles in motion at that time.**

10:37:28  4       Q.   Okay.   And you guys are several feet behind this

10:37:33  5   vehicle?

10:37:34  6       **A.   Yes, sir.**

10:37:34  7       Q.   A couple of blocks?

10:37:36  8       **A.   One or two blocks.**

10:37:37  9       Q.   Okay.   And a block -- 12 blocks make up a mile;

10:37:41  10  correct?

10:37:43  11      **A.   Yes, depending on how long that block is, obviously.**

10:37:46  12      Q.   So you're about 2/12 of a mile or 1/6 of a mile behind

10:37:55  13  this vehicle?

10:37:55  14      **A.   Or less.**

10:37:56  15      Q.   And from that distance you're able to observe that a

10:38:00  16  turn signal was, in fact, used?

10:38:03  17      **A.   Yes.**

10:38:03  18      Q.   And was that turn signal -- I mean, it took you,

10:38:06  19  obviously, some time to recognize the turn signal and to

10:38:08  20  process that.   I mean, would you agree that that turn signal

10:38:12  21  was, you know, one thousand one, one thousand two, one thousand

10:38:15  22  three, one thousand four, one thousand five, one thousand six,

10:38:19  23  one thousand seven, one thousand eight, I mean, where in there

10:38:23  24  would you put it?

10:38:24  25      **A.   Well, as I testified to earlier, I don't guess on time**

10:38:30   1   lengths.   I -- how I used or how I measured or estimated my

10:38:34   2   distance that night was using a landmark, which was the front

10:38:39   3   of that parked car which I estimated to be approximately 50

10:38:42   4   feet from the intersection.   So I can't testify to how long it

10:38:45   5   is because if a turn signal is activated and the vehicle is

10:38:52   6   going one mile an hour, it would be on for, obviously, several

10:38:55   7   seconds still not within a hundred feet of that intersection.

10:38:57   8        Q.   But there would be certainly ample notice that they're

10:39:00   9   getting ready to turn; correct?

10:39:01   10       A.   I don't know.

10:39:02   11       Q.   So let me ask you this then:  Given your interpretation

10:39:04   12   of this statute, let's say -- first of all, this is a

10:39:08   13   residential neighborhood; right?

10:39:09   14       A.   Yes.

10:39:09   15       Q.   Okay.  I'm driving in the neighborhood, and I'm looking

10:39:14   16   for an address, and then I go past the address and so I stop

10:39:25   17   and I want to turn around in somebody's driveway.  Are you

10:39:29   18   saying that I have to go another hundred feet before I can turn

10:39:35   19   into somebody's driveway and turn around so I give my turn

10:39:39   20   signal a hundred feet?

10:39:39   21       A.   I believe that's what the law says.

10:39:42   22       Q.   Are you also saying then that if I go up to the

10:39:44   23   intersection there of Thirteenth and Woodlawn and I want to

10:39:49   24   turn on -- I get to the stoplight and I'm sitting there at the

10:39:53   25   stoplight and I go, "Oh, wait a minute.  I need to run over

10:39:57   1    here to Walgreen's, so I think what I'll do is turn on my turn

10:40:00   2    signal and make a turn at the end of this light," I've now

10:40:03   3    committed a traffic infraction; is that what you're saying?

10:40:06   4        **A.  Yes.**

10:40:06   5        Q.   So I have to go another hundred feet or more and turn

10:40:12   6    somewhere else; I can't change my mind while I'm driving or

10:40:16   7    you're going to give me a ticket?

10:40:17   8        **A.  Are we talking about this hypothetically in that**

10:40:20   9    **situation?**

10:40:20  10        Q.   Yes.

10:40:21  11        **A.  You do have to signal 100 feet before you make a turn.**

10:40:24  12        Q.   So I need to back my car up a hundred feet and then

10:40:27  13    turn on the turn signal so I can make the turn?

10:40:30  14        **A.  Not necessarily.  You can drive forward, activate your**

10:40:35  15    **turn signal, and then turn a hundred feet after you activate**

10:40:38  16    **your turn signal.**

10:40:39  17        Q.   Isn't this turn signal really just a pretext to get

10:40:44  18    into this vehicle?

10:40:45  19        **A.  I would say that this was a pretext stop.**

10:40:48  20        Q.   Okay.  Would you also agree that whenever the

10:40:51  21    individual that was in the car, you were calling him Cesar

10:40:57  22    Reyes?

10:40:57  23        **A.  No, I never -- I never called him by the name Cesar**

10:41:01  24    **Reyes.  I said that whenever I got to the front passenger**

10:41:05  25    **window and I had a chance to look at the driver's face, he**

10:41:09   1    **appeared to resemble Cesar Reyes.**

10:41:12   2        Q.   And you were wrong about that as well; correct?

10:41:14   3        **A.   I was wrong about that.   He was not Cesar Reyes.**

10:41:22   4                    (Whereupon, a sotto voce discussion was had

10:41:23   5                    between Mr. Sevart and the defendant.)

10:41:27   6                    MR. SEVART:  No further questions, Your Honor.

10:41:29   7                    THE COURT:  Redirect, Ms. Jacobs?

10:41:31   8                    MS. JACOBS:  Your Honor, I have no additional

10:41:32   9    questions for Officer Henry.

10:41:33   10                   THE COURT:  May this witness step down?

10:41:34   11                   MS. JACOBS:  Yes, Your Honor.

10:41:35   12                   THE COURT:  Officer Henry, you may step down.

10:41:37   13   You're excused from the court.  Thank you.

10:41:39   14                   THE WITNESS:  Thank you.  Would you like me to

10:41:40   15   leave these up here?

10:41:41   16                   THE COURT:  Yes, would you, please.

10:41:43   17                   (Witness excused from the witness stand.)

10:41:51   18                   THE COURT:  Ms. Jacobs, do you have any more

10:41:52   19   witnesses?

10:41:52   20                   MS. JACOBS:  Your Honor, the Government does not

10:41:53   21   have any additional witnesses.  Just for bookkeeping purposes,

10:42:00   22   I believe Government's Exhibits 1, 2, 3, and 4 have been

10:42:04   23   admitted.

10:42:04   24                   THE COURT:  That's correct.

10:42:04   25                   MS. JACOBS:  And the Government has no additional

```
10:42:06   1   evidence.
10:42:06   2             THE COURT:  All right.  Thank you, Ms. Jacobs.
10:42:07   3             Mr. Sevart, is there any evidence that the
10:42:10   4   defendant wishes to put on?
10:42:11   5             MR. SEVART:  If I may have one moment.
10:42:12   6             THE COURT:  Absolutely.
10:42:12   7             (Whereupon, a sotto voce discussion was had
10:42:13   8             between Mr. Sevart and the defendant.)
10:42:22   9             MR. SEVART:  Your Honor, we would rest on our
10:42:24   10  cross-examination.
10:42:25   11            THE COURT:  Very well.  The Court will consider
10:42:27   12  all the evidence submitted.
10:42:37   13            (Discussion off the record.)
10:42:37   14            THE COURT:  How long do you think y'all might want
10:42:40   15  to argue?  Should we take a break?
10:42:43   16            MS. JACOBS:  Your Honor, I've been sitting here
10:42:45   17  drinking coffee and water and I'll appreciate taking a break.
10:42:47   18            THE COURT:  We'll take a break.  Let's come back
10:42:49   19  at about 11:00 o'clock.  We'll be in recess until at that time.
10:43:00   20            CLERK KUHLMAN:  All rise.
10:43:01   21            (A recess was taken from 10:43 to 11:02 A.M.)
11:02:22   22            CLERK KUHLMAN:  All rise.
11:02:22   23            THE COURT:  You may be seated.
11:02:28   24            This is defendant's motion but Government has the
11:02:33   25  burden.  So, Ms. Jacobs, why don't you lead off for us.
```

11:02:36    1          MS. JACOBS:  Thank you, Your Honor.  There are two

11:02:37    2    issues raised in this case:  The first one was whether or not

11:02:41    3    the stop was a legal stop and the second one is whether or not

11:02:45    4    the defendant's statements that he made were in violation of

11:02:49    5    his constitutional rights.

11:02:51    6          Addressing the statements really quickly,

11:02:54    7    reviewing the defendant's motion before we came in today, it

11:02:57    8    appears that the argument regarding the statements is that

11:03:00    9    either that *Miranda* was never issued or they asked questions

11:03:03   10    prior to *Miranda*.  And that is not what the evidence showed

11:03:07   11    today.  And, in fact, Officer Hornberger stated that it was at

11:03:10   12    12:07 A.M., when he issued *Miranda*, when he began to then

11:03:14   13    question the defendant after the issuance of the *Miranda*

11:03:18   14    warnings, after the defendant waived his rights, and he agreed

11:03:21   15    to participate in an interview with him.  So I don't think

11:03:27   16    there's any question, at least there's no evidence to the

11:03:29   17    contrary, that those statements were after *Miranda*.

11:03:33   18          THE COURT:  Except for the one statement.

11:03:35   19          MS. JACOBS:  Except for the statement of maybe

11:03:39   20    what's -- I think they asked him what his name was and he said

11:03:42   21    his name was Jesus -- I think he said his name, and then very

11:03:46   22    they verified that with his ID.  He made a voluntary statement

11:03:49   23    that he was an absconder prior to that, and then he made a

11:03:52   24    voluntary statement after Officer Henry stated that he believed

11:03:56   25    there was something illegal in the victim, and his statement

11:04:00  1   after that was there's a blunt on the floorboard.

11:04:04  2              That issue wasn't raised very -- at least it

11:04:08  3   wasn't raised in the motions, but addressing it right now, the

11:04:11  4   Government would submit that that was a voluntary statement.

11:04:14  5   There's no evidence that that statement by Officer Henry was

11:04:18  6   made to elicit any kind of incriminating information from the

11:04:22  7   defendant.  It was a statement of explanation as to why the K-9

11:04:26  8   was ordered at that point.

11:04:28  9              THE COURT:  A statement of explanation?

11:04:31 10              MS. JACOBS:  It was after he ordered a K-9, and

11:04:33 11   then he then says to the defendant, "I think there's something

11:04:35 12   illegal in your vehicle."  There was no questioning at that

11:04:39 13   point.

11:04:39 14              THE COURT:  Officer Hornberger's testimony was

11:04:41 15   that it actually was asked as a question, "Why do you not want

11:04:46 16   us to search the vehicle?"  Although Officer Hornberger said

11:04:48 17   that's what Officer Henry said, Officer Henry's testimony

11:04:51 18   itself was slightly different.

11:04:53 19              MS. JACOBS:  And I agree, and I think if you look

11:04:55 20   at -- but I think the Court has to weigh two things.  You have

11:04:58 21   Officer Hornberger who says, "I remember Officer Henry maybe

11:05:01 22   asking a question."  But I think that his testimony, compared

11:05:04 23   to Officer Henry, when Officer Henry said, "I did not ask a

11:05:08 24   question," how Officer Hornberger remembers what he heard

11:05:11 25   compared to what Officer Henry actually said, I think that

11:05:14  1   clearly Officer Henry's remembrance of that event is going to

11:05:18  2   be clearer than what Officer Hornberger remembered.  And

11:05:21  3   clearly Officer Henry stated he did not ask a question; he gave

11:05:25  4   an explanation of "I think there's something illegal in that

11:05:27  5   vehicle."

11:05:28  6             THE COURT:  Did the defendant ask why a K-9 search

11:05:32  7   had been ordered?

11:05:34  8             MS. JACOBS:  Your Honor, in my motion I said that

11:05:36  9   he had.  In my conversation -- that's not what the evidence was

11:05:42  10  today.  Let me just put it there.

11:05:43  11            THE COURT:  So if there wasn't a question on the

11:05:47  12  floor, so to speak, as to the defendant wondering why -- I

11:05:54  13  mean, there was testimony the defendant asked why he was

11:05:57  14  stopped, but as to this issue, if there wasn't a question on

11:06:00  15  the floor as to why a K-9 had been ordered, then Officer

11:06:04  16  Henry's statement may have been explanatory but might it also

11:06:10  17  have been the sort of statement designed to solicit a response?

11:06:14  18            MS. JACOBS:  I don't think there's any evidence to

11:06:16  19  support that.  And, in fact, Officer Henry's statement --

11:06:19  20            THE COURT:  Well, there wouldn't be any evidence.

11:06:21  21  I mean, that's a question of intent --

11:06:22  22            MS. JACOBS:  Sure.

11:06:22  23            THE COURT:  -- or the likely flow of a

11:06:26  24  communication.  That's not the sort much thing you're going to

11:06:28  25  have evidence on.  I think that's the sort of thing I have to

| | | |
|---|---|---|
| 11:06:30 | 1 | draw inferences on. |
| 11:06:32 | 2 | MS. JACOBS:  But it was Officer Henry's testimony |
| 11:06:35 | 3 | when he said, "I gave it as explanation."  He didn't testify |
| 11:06:38 | 4 | that he gave it to see what the defendant would say.  He didn't |
| 11:06:41 | 5 | say it to see what the defendant would do or if he would change |
| 11:06:44 | 6 | his mind on consent, and at that point they actually had a K-9 |
| 11:06:48 | 7 | on the way.  So that statement was an explanatory statement. |
| 11:06:53 | 8 | Even if the Court was to find that that statement |
| 11:06:56 | 9 | was designed to elicit incriminating evidence and, therefore, |
| 11:07:00 | 10 | that statement should be thrown out, the Government would argue |
| 11:07:03 | 11 | that inevitable discovery in this case would kick in. |
| 11:07:05 | 12 | THE COURT:  What would be inevitable discovery? |
| 11:07:07 | 13 | MS. JACOBS:  We had a K-9 that was already -- |
| 11:07:09 | 14 | THE COURT:  K-9 was called off.  K-9 never |
| 11:07:12 | 15 | arrived. |
| 11:07:12 | 16 | MS. JACOBS:  It was called off after the |
| 11:07:13 | 17 | defendant -- or after the drugs were found, so there was |
| 11:07:16 | 18 | still -- I mean, the K-9 was on the way and it was only called |
| 11:07:20 | 19 | off either once the defendant made a statement or once they |
| 11:07:22 | 20 | were actually searching the vehicle and found the dope. |
| 11:07:25 | 21 | THE COURT:  So it's inevitable because you're |
| 11:07:28 | 22 | asking me to assume that the K-9 would have hit? |
| 11:07:33 | 23 | MS. JACOBS:  Your Honor, the -- if this was a case |
| 11:07:36 | 24 | that we had dope that was in a plastic container, covered in |
| 11:07:42 | 25 | kitty litter, hidden somewhere else, then I would say that |

11:07:46  1    would be a stretch for the Court to find.  But this case is

11:07:48  2    completely different.  We had a marijuana blunt, laying out on

11:07:52  3    the floorboard of the vehicle, that was open.  It wasn't

11:07:56  4    concealed in any way.  And I think the Court can make that leap

11:08:01  5    to say a K-9 would alert on a vehicle where there's open

11:08:04  6    marijuana inside of the vehicle.

11:08:05  7            There are times that K-9s don't alert, again when

11:08:11  8    it's concealed or when it's hidden or when they've done some

11:08:14  9    things, but that's not the case in this case.

11:08:15  10            THE COURT:  All right.

11:08:16  11            MS. JACOBS:  And then addressing the stop, I think

11:08:18  12    you had two officers who testified that, regardless of whether

11:08:22  13    or not it was 20 feet or 50 feet or 80 feet, they were able to

11:08:25  14    observe the defendant's white vehicle travel around a parked

11:08:29  15    car and able to make a clear determination that that car was

11:08:33  16    less than a hundred feet away from the stop sign.  It was only

11:08:36  17    after the white vehicle traveled around the car, the parked

11:08:40  18    car, that the traffic signal was initiated.  So clearly they

11:08:45  19    both testified that this was a traffic violation in that the

11:08:50  20    traffic signal was not initiated within a hundred feet of the

11:08:52  21    stop.

11:08:53  22            THE COURT:  All right.  Thank you, Ms. Jacobs.

11:08:55  23            Mr. Sevart?

11:08:56  24            MR. SEVART:  Thank you, Your Honor.  May it please

11:08:58  25    the Court, Exhibit No. 4 shows a cigar.  It doesn't show a

11:09:04  1   marijuana joint.  Doesn't show contraband in and of itself.  It

11:09:08  2   shows a cigar.

11:09:09  3               THE COURT:  Well, I mean, I can't tell from

11:09:11  4   looking at the photo what it is, but the testimony is that it

11:09:14  5   was a marijuana blunt.

11:09:17  6               MR. SEVART:  I understand what the testimony was.

11:09:22  7   But I was just pointing -- she was trying to make an analogy

11:09:26  8   that this wasn't wrapped in a bunch of stuff and that it was

11:09:30  9   very clear and obvious that it was a marijuana cigarette.

11:09:32  10              THE COURT:  I think she's making that in terms of

11:09:34  11  a K-9.

11:09:35  12              MR. SEVART:  Okay.

11:09:35  13              THE COURT:  Not in terms of observation.  In fact,

11:09:37  14  I think the testimony was they didn't observe this until after

11:09:40  15  the statement had been made by Mr. Reyes.  I think her

11:09:43  16  statement was this was marijuana, which the evidence was that

11:09:47  17  it was, laying out in the open, not concealed, a dog would have

11:09:50  18  hit on it.  I think that was her only point.

11:09:52  19              MR. SEVART:  I think the -- you know, I certainly

11:09:56  20  would ask the Court to, you know, to consider the briefs that

11:09:59  21  were filed in the case, the motions that were filed.  But I

11:10:03  22  think what has really been flushed out here is this whole thing

11:10:06  23  initially stems from the stop itself, because if the stop

11:10:10  24  itself is bad, then everything else goes away anyway.  And so

11:10:16  25  it's -- this is a very costly turn signal violation, not only

11:10:21   1   for my client but for the citizens who would then have to incur

11:10:26   2   all the incarceration.

11:10:27   3            But beyond that, there has to be some sort of

11:10:31   4   check and balance on law enforcement, that they don't just turn

11:10:36   5   this into some sort of a game.  They know what the rule is, so

11:10:39   6   they got to make up some nebulous traffic violation so that

11:10:44   7   they can then do whatever they want with --

11:10:46   8            THE COURT:  Officer Henry agreed it was a pretext

11:10:48   9   stop, but I think the law permits that.  I mean, that may or

11:10:53  10   may not be good public policy, but that's beyond my

11:10:56  11   jurisdiction to decide what the law should be.

11:10:58  12            MR. SEVART:  Well --

11:10:59  13            THE COURT:  What the law is is that it permits, as

11:11:03  14   long as there's a traffic infraction observed by the officers

11:11:06  15   or the officers have a reasonable belief that they observed a

11:11:08  16   traffic infraction, they can effect a lawful stop, even if they

11:11:12  17   have other motivations.  Isn't that what the law is?

11:11:15  18            MR. SEVART:  I -- I'm not -- I don't feel

11:11:20  19   comfortable going that far out on a limb.  I don't know why

11:11:23  20   they don't just be honest and say, "Yeah, we wanted to get in

11:11:26  21   the vehicle but we had to wait till the traffic violation."

11:11:29  22            THE COURT:  I think that's what the law is.  I

11:11:31  23   don't think -- I don't think there's much ambiguity into this

11:11:35  24   status of the law, that if the officers have reasonable belief

11:11:38  25   that they observed a traffic violation, they can stop the car,

11:11:43   1   even though their motivation for stopping the car is to

11:11:46   2   investigate suspected drug activity.

11:11:50   3              MR. SEVART:  Well, and -- and I understand where

11:11:53   4   you're coming from.  But I think we have to even back up a

11:11:57   5   little farther, 'cause the law, as I understand it, and as I

11:11:59   6   cited in my brief, is that first you have to look at was there

11:12:03   7   really a basis for a stop; and then, second of all, was the

11:12:07   8   activity that occurred after that reasonable in light of their

11:12:11   9   basis for the stop.

11:12:11   10             THE COURT:  I agree with that.

11:12:12   11             MR. SEVART:  And so the first prong of this is,

11:12:18   12   you know, do we really believe that there was a turn signal

11:12:22   13   violation as anticipated and outlawed by Kansas statute or city

11:12:28   14   ordinance.  And, I mean, first of all, they didn't bring you in

11:12:31   15   a city ordinance for us to consider.  They didn't tell us what

11:12:34   16   statute they were going under.  I'm kind of assuming that they

11:12:38   17   were going under a generic sort of state statute.  But the

11:12:42   18   bottom line of it is --

11:12:45   19             THE COURT:  Are you disputing that the law does

11:12:47   20   not require a turn signal a hundred feet in advance?

11:12:49   21             MR. SEVART:  I -- I don't think that it's a strict

11:12:52   22   liability statute.

11:12:52   23             THE COURT:  I don't know what that means.  This

11:12:54   24   isn't a tort claim.

11:12:55   25             MR. SEVART:  I understand.

11:12:56  1          THE COURT:  All criminal cases, even if they're

11:12:58  2   just traffic, are -- I mean, you used a phrase "strict

11:13:04  3   reliability."  That's not -- I mean, in a criminal case, either

11:13:06  4   the law's violated or it's not.

11:13:08  5          MR. SEVART:  Well, and what I'm saying is that the

11:13:13  6   intent of the law is that there be some signalling before you

11:13:18  7   turn, and there was signalling before they turned.

11:13:20  8          THE COURT:  But if the law says signal before you

11:13:22  9   turn, that's one thing.  If it says a hundred feet, you may

11:13:25  10  think that's unduly harsh or unduly restrictive --

11:13:28  11         MR. SEVART:  Well.

11:13:29  12         THE COURT:  -- but that's what the law says,

11:13:30  13  that's what the law says.

11:13:31  14         MR. SEVART:  But Section A -- I cited the law, the

11:13:34  15  Kansas statute in my brief, and Section A talks about

11:13:37  16  "reasonably safe."  And then it does mention something about

11:13:41  17  "as further stated in or provided in the statute."  But Section

11:13:48  18  B talks about a hundred feet.  But I don't know if they're

11:13:54  19  going under Section A or Section B or a city ordinance or some

11:13:58  20  other.

11:13:59  21         THE COURT:  Tell me --

11:14:00  22         MR. SEVART:  It's on page --

11:14:02  23         MS. JACOBS:  It's page 5, Your Honor.

11:14:03  24         MR. SEVART:  Yes, down at the bottom.

11:14:05  25         THE COURT:  Page 5?

| | | |
|---|---|---|
| 11:14:07 | 1 | MS. JACOBS:  In Mr. Sevart's motion. |
| 11:14:10 | 2 | MR. SEVART:  Yes, page 5 of my motion and |
| 11:14:16 | 3 | memorandum. |
| 11:14:17 | 4 | THE COURT:  Oh, I'm sorry, I'm sorry.  I'm looking |
| 11:14:18 | 5 | at the wrong document. |
| 11:14:19 | 6 | MR. SEVART:  And I apologize.  I usually file a |
| 11:14:23 | 7 | motion and then a memorandum. |
| 11:14:25 | 8 | THE COURT:  No, no, it's my fault.  I was looking |
| 11:14:25 | 9 | at the wrong document.  All right.  All right.  Okay. |
| 11:14:44 | 10 | MR. SEVART:  Section A is talking about reasonable |
| 11:14:47 | 11 | safety. |
| 11:14:47 | 12 | THE COURT:  Right.  Section A says you can't turn |
| 11:14:52 | 13 | unless you can do it with reasonable safety. |
| 11:14:53 | 14 | MR. SEVART:  Right. |
| 11:14:54 | 15 | THE COURT:  And without giving appropriate signal. |
| 11:14:56 | 16 | MR. SEVART:  Right. |
| 11:14:57 | 17 | THE COURT:  And then Section B would define what |
| 11:14:59 | 18 | the law says is an appropriate signal. |
| 11:15:05 | 19 | MR. SEVART:  And that may be.  But what I'm also |
| 11:15:08 | 20 | getting at is that they're wanting you to construe that hundred |
| 11:15:13 | 21 | feet strictly but not bring in strict proof.  And we don't have |
| 11:15:18 | 22 | any evidence that these guys were trained to guess distances. |
| 11:15:21 | 23 | In fact, they can't even guess the same distance.  And the |
| 11:15:24 | 24 | reason why I was trying to point out timing is for twofold: |
| 11:15:29 | 25 | one, it would -- obviously, there was enough time for them to |

| | | |
|---|---|---|
| 11:15:32 | 1 | recognize what was going on.  But the other thing is is that |
| 11:15:37 | 2 | this is a 30-mile-an-hour zone, and when you're going 30 miles |
| 11:15:42 | 3 | an hour you're traveling at about 44 feet per second, so you're |
| 11:15:46 | 4 | going to travel a hundred feet within less than three seconds. |
| 11:15:50 | 5 | And even slowing down, you're going to be less than four |
| 11:15:53 | 6 | seconds.  And these guys didn't say no to my five-second |
| 11:15:57 | 7 | suggestion.  They just said, "We didn't count." |
| 11:16:00 | 8 | THE COURT:  Well, the law says a hundred feet. |
| 11:16:02 | 9 | MR. SEVART:  I understand.  So how do we know what |
| 11:16:04 | 10 | a hundred feet is?  That's about two seconds of traveling at 30 |
| 11:16:08 | 11 | miles an hour, three at the most.  And so that's why timing is |
| 11:16:15 | 12 | important. |
| 11:16:15 | 13 | THE COURT:  See, but the issue here, Mr. Sevart, |
| 11:16:19 | 14 | is not whether, in fact, Mr. Reyes failed to turn his signal on |
| 11:16:25 | 15 | 100 feet in advance, because you're not defending him for |
| 11:16:28 | 16 | having a traffic ticket for that. |
| 11:16:30 | 17 | MR. SEVART:  Well -- |
| 11:16:30 | 18 | THE COURT:  The issue here is whether law |
| 11:16:32 | 19 | enforcement reasonably believed that he failed to turn his |
| 11:16:35 | 20 | signal on a hundred feet in advance, because if they reasonably |
| 11:16:39 | 21 | believed that, even though perhaps later that would be proven |
| 11:16:42 | 22 | wrong, if they reasonably believed that, then the law is that |
| 11:16:45 | 23 | they had a valid reason to stop him. |
| 11:16:47 | 24 | MR. SEVART:  That then brings us back to the |
| 11:16:49 | 25 | pretext thing, how reasonable is their belief in this |

11:16:53  1   situation.  I mean, they're two blocks back.  They're not right

11:16:56  2   on top of this, and they didn't do anything -- they didn't even

11:17:00  3   take a photograph.  They didn't mark it off with their feet.

11:17:03  4   They didn't do anything to substantiate their guess or

11:17:10  5   speculation that it was less than a hundred feet.  Because --

11:17:13  6   and that's very critical, because if their guess or speculation

11:17:18  7   is wild-eyed, then that's not reasonable belief.

11:17:23  8          If it's a biased guess because they want to do a

11:17:29  9   pretext stop, then it becomes unreasonable as well.  And, you

11:17:39 10   know, again, this whole thing hinges on, I guess, 50 feet,

11:17:44 11   because one officer says it was 50 and the statute says it's

11:17:47 12   supposed to be a hundred.  50 feet, that's a little over a

11:17:50 13   second of travel at 30 miles per hour.

11:17:55 14          THE COURT:  The law says what it says.

11:17:58 15          MR. SEVART:  But --

11:17:59 16          THE COURT:  And this isn't horseshoes where you

11:18:01 17   get points for being close.

11:18:03 18          MR. SEVART:  Well, I appreciate that analogy.  I

11:18:06 19   think that's good.  But I think that the bottom line, you know,

11:18:16 20   is that when so much is on the line, the decision of what is

11:18:22 21   reasonable and unreasonable becomes much more critical.  And if

11:18:27 22   he hadn't have used a turn signal, that's a whole different

11:18:30 23   ball game.  But they're wanting to split hairs with us, and

11:18:36 24   with you, and that becomes unreasonable and that becomes a

11:18:43 25   game, so to speak.

11:18:44    1            THE COURT:  Well, Mr. Sevart, I'll agree with you

11:18:48    2    that most pretext stops in cases that originate like this one

11:18:53    3    are for traffic infractions that a mother and a father and two

11:19:00    4    children in a car dressed up to go to church on a Sunday

11:19:03    5    morning would never be stopped for if they did the same thing.

11:19:07    6    I'll agree with that.  But the law says it doesn't matter.  The

11:19:10    7    law is clear that, even if the stop is based on a pretext, that

11:19:15    8    does not invalidate the stop.  And the law is clear that even

11:19:18    9    if officers may not normally stop someone for a traffic

11:19:22   10    infraction, if in fact they reasonably believe the traffic

11:19:25   11    infraction occurred, then they can make a lawful stop, and it

11:19:28   12    doesn't matter that it's for a, as you put it, a strict

11:19:33   13    enforcement of the law and it doesn't matter that they have

11:19:35   14    other motivations.  The law's clear on those issues.

11:19:38   15            And so I don't think your argument -- I understand

11:19:40   16    why you're outraged by that, but I don't think legally your

11:19:46   17    argument goes anywhere.

11:19:46   18            MR. SEVART:  Well, then it falls back to a factual

11:19:49   19    determination.  And I'd ask you to disbelieve 'em, that

11:19:52   20    they're --

11:19:52   21            THE COURT:  What do I have to disbelieve them on?

11:19:54   22            MR. SEVART:  What's that?

11:19:55   23            THE COURT:  And what's the basis for me to

11:19:57   24    disbelieve them?

11:19:58   25            MR. SEVART:  That, well, it's not necessarily

11:20:01  1   disbelief, but just simply that there's been insufficient

11:20:04  2   evidence to support their opinion or their guess.

11:20:07  3          THE COURT:  They both testified separately that

11:20:10  4   they thought the turn signal was activated after he passed the

11:20:14  5   car, and they both testified separately that they thought that

11:20:17  6   was less than a hundred feet.  And I didn't find that testimony

11:20:21  7   to be incredible.

11:20:23  8          MR. SEVART:  Okay.  Well, then we move to the

11:20:26  9   second prong, and that is were their actions afterwards

11:20:31  10  reasonable.  And I would submit that they were not reasonable,

11:20:35  11  that they, based on a turn signal violation, immediately remove

11:20:40  12  him from the car, they're calling him by a different name, they

11:20:43  13  think they've got somebody else.

11:20:43  14         THE COURT:  What significance is it that at least

11:20:46  15  one of the officers initially identified him as Cesar Reyes?

11:20:49  16         MR. SEVART:  Well, it has -- one, I mean, it goes

11:20:52  17  back to their credibility whether you ought to believe them on

11:20:55  18  the first prong.  You know, they're mistaken about --

11:20:58  19  obviously, their eyesight or something's off 'cause they're

11:21:01  20  misidentifying this guy.

11:21:02  21         THE COURT:  I don't know what Cesar Reyes looks

11:21:04  22  like.  Maybe they're spitting images.  I mean, I can't --

11:21:07  23         MR. SEVART:  I don't know.

11:21:08  24         THE COURT:  I can't tell you that the fact that

11:21:10  25  they initially thought he was somebody else is testimony that

| | | |
|---|---|---|
| 11:21:12 | 1 | their eyesight's bad. |
| 11:21:13 | 2 | MR. SEVART: Well, I'm just saying -- |
| 11:21:15 | 3 | THE COURT: If they mistook me for Tom Selleck, |
| 11:21:18 | 4 | that would be a pretty clear indication that they had bad |
| 11:21:20 | 5 | eyesight, but I don't know in this case -- |
| 11:21:23 | 6 | MR. SEVART: Well, I just think, again, that it -- |
| 11:21:26 | 7 | you know, the one officer asked if I'm calling him a liar. I |
| 11:21:28 | 8 | don't think I have to call him a liar. I think I just have to |
| 11:21:30 | 9 | call him unreasonable in his beliefs and that's the end of the |
| 11:21:34 | 10 | case. And I think the "unreasonable in his beliefs" are based |
| 11:21:39 | 11 | on the fact that he had pretext motivation and -- |
| 11:21:43 | 12 | THE COURT: Well, let me -- |
| 11:21:44 | 13 | MR. SEVART: And I'm not -- |
| 11:21:45 | 14 | THE COURT: Let me save you some time, Mr. Sevart. |
| 11:21:47 | 15 | MR. SEVART: Uh-huh. |
| 11:21:47 | 16 | THE COURT: I find their testimony that the turn |
| 11:21:49 | 17 | signal was activated less than a hundred feet to be credible, |
| 11:21:54 | 18 | that they reasonably believed that to be true. Whether it is |
| 11:21:56 | 19 | true or not is legally irrelevant. Whether they had other |
| 11:21:59 | 20 | motivations for making the stop are legally irrelevant. If |
| 11:22:02 | 21 | they had a reasonable belief that a traffic infraction had |
| 11:22:05 | 22 | occurred, the stop, at its inception, is lawful. And I find |
| 11:22:09 | 23 | that they had a reasonable belief that he activated a turn |
| 11:22:13 | 24 | signal less than a hundred feet before the intersection, and so |
| 11:22:16 | 25 | the stop at its inception was lawful. |

11:22:18  1            So let's move the argument to that point.

11:22:21  2            MR. SEVART:  Sure.  Well, okay, we're talking

11:22:23  3    about turn signal violation, and they should have just issued a

11:22:27  4    citation and had him go on.  There's nothing in plain view that

11:22:30  5    would indicate a need to go inside of the vehicle.  And they're

11:22:33  6    removing him from the car, they're immediately putting him

11:22:37  7    under arrest and they're immediately going in and searching.

11:22:40  8            THE COURT:  Well, let's parse this down.  The

11:22:43  9    testimony was they removed him from the car because his actions

11:22:47  10   when they first initiated the stop gave them concern about

11:22:52  11   whether he was going to flee, and so they asked him to step

11:22:56  12   out.

11:22:56  13           MR. SEVART:  Well --

11:22:57  14           THE COURT:  So that's the first stage.  Is that

11:22:58  15   unreasonable?

11:22:59  16           MR. SEVART:  I think it's unbelievable.

11:23:02  17           THE COURT:  It's unbelievable?

11:23:03  18           MR. SEVART:  Uh-huh, that they were thinking there

11:23:06  19   was going to be an ambush or that somebody was leaving.  It

11:23:09  20   sounds to me that they're at a stop sign, going onto a busy

11:23:13  21   road like Thirteenth, and the person slowly turns onto

11:23:17  22   Thirteenth and slowly turns into the first-available driveway

11:23:22  23   so that they're not out on Thirteenth Street.  I think that's

11:23:25  24   showing a driver who's showing courtesy to a law enforcement

11:23:30  25   officer, as opposed to somebody trying to evade and elude.

11:23:36   1          There was -- you know, this isn't a situation

11:23:39   2    where somebody's driving down a road, obviously sees a law

11:23:43   3    enforcement officer beside 'em, stops the car and then whenever

11:23:45   4    the officers get out, speeds off.

11:23:48   5          THE COURT:  Well, no, this is a situation where

11:23:50   6    someone's at a stop sign, sees officers gets out, and then

11:23:54   7    slowly proceeds.

11:23:55   8          MR. SEVART:  Well, we don't know -- there's no

11:23:57   9    evidence that he saw anybody get out of the car.  There's no

11:24:01  10    evidence that the officers --

11:24:01  11          THE COURT:  No, but the officers could have

11:24:03  12    assumed that he did because their lights were activated and

11:24:05  13    that tends to draw one's attention, even from a rearview

11:24:09  14    mirror.

11:24:10  15          MR. SEVART:  Well --

11:24:10  16          THE COURT:  Whether he did or not, again, is

11:24:12  17    irrelevant if the officers reasonably thought that he should

11:24:14  18    have seen them.  And I think that when it's night and there are

11:24:18  19    red-and-blue lights flashing in your rearview mirror, you might

11:24:20  20    tend to notice that.

11:24:21  21          MR. SEVART:  Well, but I think it's also

11:24:23  22    reasonable that somebody might turn into the first-available

11:24:26  23    driveway.

11:24:26  24          THE COURT:  Both of those are reasonable, but the

11:24:28  25    officers aren't required to put their personal safety in

11:24:31  1    jeopardy by guessing which one's more reasonable.

11:24:34  2         MR. SEVART:  Well, but I think they have the

11:24:38  3    burden of proof and, you know, that inferences and so forth

11:24:43  4    don't just automatically go in their direction.  I think it's

11:24:46  5    all a matter of reasonableness.  And, again, it's a turn signal

11:24:53  6    ticket, and for them then there's no smell of marijuana.

11:24:57  7         THE COURT:  Right.  But you have to take these one

11:25:00  8    step at a time, and we've already talked about the stop.  And

11:25:02  9    then the next issue is, because of the car's ambiguous

11:25:07  10   response, they asked the driver to step out of the car.  They

11:25:12  11   didn't immediately arrest him at that point, but they asked him

11:25:15  12   to step out of the car.  And unless asking him to do that --

11:25:21  13        MR. SEVART:  Well, it's certainly detaining him

11:25:23  14   beyond merely -- I mean, that's not necessary to give him a

11:25:26  15   ticket for --

11:25:28  16        THE COURT:  Well, it's not an unlawful detention

11:25:31  17   because we're still in the first 60 seconds of the stop when he

11:25:34  18   steps out of the car.

11:25:34  19        MR. SEVART:  No.

11:25:35  20        THE COURT:  That's the first thing they ask him to

11:25:37  21   do, is step out of the car.  That doesn't unlawfully prolong a

11:25:40  22   stop.

11:25:40  23        MR. SEVART:  But it's -- that in and of itself

11:25:43  24   isn't necessary to issue a ticket for a turn signal violation.

11:25:45  25        THE COURT:  No, but if they're concerned about

| | | |
|---|---|---|
| 11:25:48 | 1 | whether he's going to remain in this spot, I mean, the fact |
| 11:25:52 | 2 | that they asked him to step out of the car, is that |
| 11:25:55 | 3 | prejudicial?  How did that prejudice the rights of Mr. Reyes? |
| 11:25:58 | 4 | MR. SEVART:  Well, if we're really slicing it very |
| 11:26:03 | 5 | thin -- |
| 11:26:03 | 6 | THE COURT:  That's what the law tells us to do -- |
| 11:26:07 | 7 | MR. SEVART:  -- taking -- |
| 11:26:08 | 8 | THE COURT:  -- to take each step law enforcement |
| 11:26:09 | 9 | does as to whether those steps were justified. |
| 11:26:11 | 10 | MR. SEVART:  Well, okay, we'll move to the next |
| 11:26:15 | 11 | stop.  They get him out.  Okay, I take it that you're okay with |
| 11:26:20 | 12 | that.  I understand.  They pat him down.  I understand.  They |
| 11:26:22 | 13 | don't find any contraband on him at that point in time.  And he |
| 11:26:27 | 14 | should be then either allowed to get back in his car or given |
| 11:26:31 | 15 | his citation and then allowed to leave. |
| 11:26:33 | 16 | THE COURT:  But he's told he has a suspended -- or |
| 11:26:35 | 17 | he confesses that he has a suspended license. |
| 11:26:38 | 18 | MR. SEVART:  Well, and they said that their policy |
| 11:26:40 | 19 | at that point in time was that they could give a notice to |
| 11:26:42 | 20 | appear. |
| 11:26:44 | 21 | THE COURT:  Their policy at that point in time was |
| 11:26:46 | 22 | that they would do an arrest and that would be followed by |
| 11:26:49 | 23 | either booking or a notice to appear. |
| 11:26:51 | 24 | MR. SEVART:  Yeah. |
| 11:26:51 | 25 | THE COURT:  But the testimony was, following |

11:26:54   1   discovering, by the defendant's own admission, that he did not

11:26:56   2   have a license, it was suspended, they run a SPIDER on him and

11:27:00   3   discover that he's in absconder status.

11:27:03   4           Now, is there anything in that sequence so far

11:27:09   5   that is inappropriate policing?  Because I don't see it.  And

11:27:13   6   once they find he's in absconder status, then they take him

11:27:17   7   into custody.

11:27:19   8           MR. SEVART:  Well, the problem on the absconder

11:27:22   9   status is that there was no testimony that any parole officer

11:27:29   10  asked them to execute their warrant or that there was a written

11:27:32   11  warrant ever served on law enforcement or --

11:27:35   12          THE COURT:  The SPIDER hit says he's in absconder

11:27:38   13  status.  That's sufficient for them at the scene of the traffic

11:27:41   14  stop to take him into custody.

11:27:43   15          MR. SEVART:  Yeah.  Well, you know, as -- and I

11:27:47   16  understand where you're going with respect to the questioning.

11:27:53   17  That's why I'm banking so much on the stop itself.

11:27:57   18          THE COURT:  Here's what you should bank on, and

11:27:59   19  it's what I asked Ms. Jacobs about.  I'm troubled -- I'm not

11:28:03   20  troubled by anything you and I've talked about so far.  I think

11:28:09   21  it's maybe something that -- whatever.  The law says pretext

11:28:15   22  stops are fine.  The law says, as you would put it, a strict

11:28:18   23  enforcement of traffic laws are fine if they have reasonable

11:28:22   24  belief that a traffic law's been violated.  All that's fine.

11:28:25   25  Officer safety makes it fine for them, if they think he may be

| | | |
|---|---|---|
| 11:28:28 | 1 | a flight risk, to have him step out of the car.  The fact that |
| 11:28:31 | 2 | he's suspended on a license and in absconder status makes it |
| 11:28:35 | 3 | not only reasonable but almost required for them to at least |
| 11:28:38 | 4 | take him into custody. |
| 11:28:40 | 5 | The thing about this case that troubles me is |
| 11:28:42 | 6 | their authorization to search the car, because it seems to me |
| 11:28:45 | 7 | that it's based on Mr. Reyes' statement that there's a blunt on |
| 11:28:51 | 8 | the floor, and that statement is in response to either a |
| 11:28:53 | 9 | question, from Mr. Hornberger's testimony, or a statement |
| 11:29:00 | 10 | inviting a response, although not grammatically a question, |
| 11:29:04 | 11 | according to Mr. Henry's testimony.  Let's assume Mr. Henry's |
| 11:29:08 | 12 | testimony's correct because he's the one that made the |
| 11:29:11 | 13 | statement or a question.  Let's assume it wasn't a question. |
| 11:29:13 | 14 | I'm still troubled as to whether that, in a pre-Mirandized |
| 11:29:18 | 15 | state, is not a question, even if not grammatically phrased as |
| 11:29:26 | 16 | such, but one that invites a response, and it's that response |
| 11:29:31 | 17 | that the officers then rely upon to give them probable cause to |
| 11:29:34 | 18 | do a search, calling off the K-9.  That's the point I think -- |
| 11:29:39 | 19 | that's the fulcrum that I think this case determination turns |
| 11:29:45 | 20 | on. |
| 11:29:46 | 21 | MR. SEVART:  Well, and I think, you know, at that |
| 11:29:48 | 22 | point in time -- I guess I was under the impression from the |
| 11:29:52 | 23 | evidence that they'd already even started their search before |
| 11:29:56 | 24 | that statement was even said, that they were calling for a K-9 |
| 11:30:00 | 25 | but that they were already -- |

11:30:02  1          THE COURT:  I don't think that was the testimony.

11:30:03  2          MR. SEVART:  Okay.

11:30:05  3          THE COURT:  I think the testimony was that they

11:30:06  4  called for a K-9, after they arrested him for being on

11:30:10  5  absconder status and they called for a K-9 because he was

11:30:13  6  associated with a residence that they'd received an anonymous

11:30:16  7  tip on and so they called for a K-9.  And, again, the law would

11:30:20  8  have let them do that.  But then they also at some point in the

11:30:23  9  sequence request Mr. Reyes' permission to search, which he

11:30:27  10  denies, as he's certainly entitled to do, and his denial does

11:30:31  11  not give constitutional grounds for a search.

11:30:33  12          But in response to that denial, Officer Henry

11:30:36  13  makes either a question or probably, more likely, a statement

11:30:44  14  that elicits a response from Mr. Reyes, and that response,

11:30:48  15  "There's a blunt on the floor of my car," then gives them

11:30:52  16  probable cause, they say, to search the car, and the search

11:30:55  17  recovers all the things that it does.

11:30:57  18          But if it were not for that statement of

11:30:59  19  Mr. Reyes', they would not have had a constitutional right to

11:31:02  20  search that car, and I'm troubled as to whether that statement

11:31:06  21  from Mr. Reyes, given in a pre-Mirandized sequence, was or is

11:31:14  22  constitutionally suspect.

11:31:15  23          MR. SEVART:  Well, and I would certainly argue

11:31:21  24  that it was the result of questioning, as the officer, the

11:31:28  25  first officer, testified to, that there was -- that the --

11:31:33  1        THE COURT:  I don't know that it matters whether

11:31:35  2   it was the result of a question or the statement that Officer

11:31:37  3   Henry made, because that statement Officer Henry made, though

11:31:40  4   not grammatically a question, still is one that sort of invites

11:31:43  5   a response.

11:31:44  6        MR. SEVART:  Well, it certainly is not -- I don't

11:31:48  7   think there's any dispute that that was done before any sort of

11:31:52  8   *Miranda* was issued.

11:31:53  9        THE COURT:  There's no dispute; that was

11:31:55 10   pre-Miranda.

11:31:56 11        MR. SEVART:  I don't think anybody disputes that

11:31:57 12   my client at that point in time was in custody.

11:31:59 13        THE COURT:  No dispute about that.  He was in

11:32:02 14   custody.  He was in a custodial status and had not been

11:32:03 15   Mirandized when that conversation occurred.

11:32:05 16        MR. SEVART:  Right.  And I would submit that it's

11:32:07 17   not an appropriate question to ask that has been approved by

11:32:13 18   courts such as "Where's your driver's license?" or "What is

11:32:15 19   your name?"

11:32:15 20        THE COURT:  It is not an identification question

11:32:17 21   that the law allows to be asked pre-*Miranda*.

11:32:21 22        MR. SEVART:  And so at that point in time, Your

11:32:23 23   Honor, I would submit that they cannot use that to get into the

11:32:28 24   vehicle, and anything -- there would not be sufficient probable

11:32:33 25   cause at that point in time to get into the car because, I

11:32:37  1   mean, first of all, he's already been removed.  Obviously, they

11:32:40  2   didn't impound the car so it couldn't be --

11:32:43  3               THE COURT:  In fact, they ended up releasing the

11:32:45  4   car to the girlfriend that night, so they didn't intend to

11:32:48  5   impound it.  Even after they discovered the contraband, they

11:32:51  6   still released it to her.

11:32:52  7               MR. SEVART:  Yes.  So that certainly can be the

11:32:57  8   issue there as well.

11:32:58  9               THE COURT:  I think that's the main issue.

11:33:02  10              MR. SEVART:  And does Your Honor have any other

11:33:04  11  questions of me?

11:33:05  12              THE COURT:  Ms. Jacobs, rebuttal?

11:33:07  13              MS. JACOBS:  No, Your Honor.  I agree with the

11:33:09  14  Court's assessment.  I think that this case turns on whether or

11:33:12  15  not the statement made by Officer Henry is considered a

11:33:16  16  statement under any kind of interrogation.  Again, the

11:33:20  17  Government would submit that that statement was made as an

11:33:22  18  explanation.  They had already called the K-9.  His

11:33:26  19  statement --

11:33:26  20              THE COURT:  Well, why would he have to make an

11:33:27  21  explanation if there wasn't a question asked?  And neither

11:33:30  22  witness testified that Mr. Reyes said, "Why are you calling a

11:33:34  23  dog?"

11:33:35  24              MS. JACOBS:  I agree.

11:33:35  25              THE COURT:  So why would Officer Henry have to or

11:33:38  1  even be entitled to provide an unsolicited explanation as to

11:33:44  2  why they're doing that?

11:33:45  3          MS. JACOBS:  I think that law enforcement, on

11:33:48  4  numerous occasions in the field, and whether or not they're in

11:33:50  5  law enforcement facility, whatever, they provide explanations,

11:33:53  6  even after defendants have maybe even exercised their *Miranda*

11:33:57  7  rights to say, "I don't want to talk."  Law enforcement, at

11:34:00  8  least in my experience, still continues to give explanation

11:34:03  9  statements to what's going on:  "I know you're not speaking.

11:34:05  10  We're taking you to the house, to the jailhouse right now.

11:34:08  11  We're going to book you and arrest you.  We don't want you to

11:34:11  12  talk."

11:34:12  13          And I think that this statement made by Officer

11:34:15  14  Henry was to the same extent when he said, "I'm not going to

11:34:18  15  give consent," they call for the dog, he then turns around and

11:34:21  16  says, "We think there's something illegal inside your vehicle.

11:34:24  17  We called for the K-9."

11:34:25  18          THE COURT:  So even if I accept Officer Henry's

11:34:27  19  testimony that his statement was not a question and that you

11:34:30  20  argue -- and I think with some weight -- that Officer Henry

11:34:32  21  would have a better recollection of what he said than Officer

11:34:35  22  Hornberger --

11:34:35  23          MS. JACOBS:  Yes, Your Honor.

11:34:38  24          THE COURT:  -- would, is that statement by Officer

11:34:46  25  Henry not one that at least invites a response and in this

| | | |
|---|---|---|
| 11:34:52 | 1 | context invites an incriminating response? |
| 11:34:55 | 2 | MS. JACOBS: I think the Court should look at two |
| 11:34:57 | 3 | things: the first would be intent and the second would be the |
| 11:35:00 | 4 | form of the statement. I think taking them in the reverse, if |
| 11:35:03 | 5 | you look at the form of the statement, it wasn't a statement -- |
| 11:35:08 | 6 | I'm trying to come up with a different statement that he could |
| 11:35:10 | 7 | have made that would have invited a response. I don't think |
| 11:35:14 | 8 | that he was making a statement -- I don't think there's any |
| 11:35:16 | 9 | evidence that he was making a statement to try to get him to |
| 11:35:19 | 10 | respond. He had already said he wasn't going to consent. I |
| 11:35:23 | 11 | don't think there's any evidence either that Officer Henry's |
| 11:35:28 | 12 | intent was to try to trick him or to try to have him make a |
| 11:35:31 | 13 | response. And, in fact, the testimony throughout this hearing |
| 11:35:34 | 14 | was that once he got out of the vehicle and he was in |
| 11:35:37 | 15 | handcuffs, this individual was compliant, he was cooperative. |
| 11:35:41 | 16 | They didn't have any problems with him. He answered questions. |
| 11:35:43 | 17 | THE COURT: But all that was post-*Miranda*. |
| 11:35:45 | 18 | MS. JACOBS: And it was. But I think that shows |
| 11:35:47 | 19 | that he wasn't -- was able to communicate with them. And, you |
| 11:35:51 | 20 | know, there was nothing to show that these officers were trying |
| 11:35:54 | 21 | to trick him into making a statement. |
| 11:35:59 | 22 | THE COURT: I guess -- I guess I'm not really sure |
| 11:36:02 | 23 | how I can ascertain Officer Henry's intent because it wasn't |
| 11:36:09 | 24 | really addressed as to why he said that. I'll go back and |
| 11:36:13 | 25 | review his testimony. |

| | | |
|---|---|---|
| 11:36:14 | 1 | MS. JACOBS:  And I would ask -- and I thought, in |
| 11:36:16 | 2 | my notes -- and my notes are written really poorly because I'm |
| 11:36:20 | 3 | writing fast -- but my notes off to the side on this state that |
| 11:36:24 | 4 | it was an explanation as to why.  I'm not sure if that came up |
| 11:36:28 | 5 | in direct or cross, but I have a note at least written in my |
| 11:36:32 | 6 | notes.  And I think if that's the testimony that's before the |
| 11:36:36 | 7 | Court, I mean, there's no other evidence to contradict that. |
| 11:36:41 | 8 | THE COURT:  And then your second position as you |
| 11:36:45 | 9 | raised in your first argument is the inevitable discovery |
| 11:36:47 | 10 | because -- |
| 11:36:47 | 11 | MS. JACOBS:  Because there was a K-9 that was on |
| 11:36:49 | 12 | the way that wasn't called off until -- I don't remember -- and |
| 11:36:53 | 13 | I don't recall if it was until after he said there was a blunt, |
| 11:36:56 | 14 | which gave them probable cause, or if it was after they found |
| 11:36:58 | 15 | it, but either way -- |
| 11:36:59 | 16 | THE COURT:  Well, there wasn't any testimony about |
| 11:37:00 | 17 | it.  In fact, I asked Officer Hornberger at the conclusion of |
| 11:37:04 | 18 | your direct, "What happened to the K-9 search?"  And he said, |
| 11:37:07 | 19 | "We called it off." |
| 11:37:08 | 20 | MS. JACOBS:  Yeah. |
| 11:37:08 | 21 | THE COURT:  But I don't know when that happened. |
| 11:37:12 | 22 | Obviously, it was called off after it was called, and this |
| 11:37:17 | 23 | conversation with Mr. Reyes occurred immediately after -- |
| 11:37:21 | 24 | MS. JACOBS:  Uh-huh. |
| 11:37:22 | 25 | THE COURT:  -- the K-9 was called, so at some |

11:37:25  1    point obviously it was called off after that conversation with

11:37:27  2    Mr. Reyes but, I guess, before it arrived.

11:37:30  3              MS. JACOBS:  And I would say after they had

11:37:32  4    probable cause already to get into the vehicle, either based on

11:37:34  5    his statement or what he saw once he shined the flashlight

11:37:37  6    inside.

11:37:37  7              THE COURT:  Well, he only saw with the flashlight

11:37:39  8    in response to a search based on Mr. Reyes' statement.

11:37:42  9              MS. JACOBS:  I agree.

11:37:43  10             THE COURT:  So the whole probable cause thing

11:37:45  11   turns on whether Mr. Reyes' statement was voluntary or whether

11:37:49  12   it was in response to a pre-Mirandized inquiry, even if not a

11:37:57  13   grammatical question.

11:37:58  14             MS. JACOBS:  I agree, Your Honor.

11:38:01  15             THE COURT:  Anything else from either of you?

11:38:04  16             MS. JACOBS:  Not by the United States, Your Honor.

11:38:05  17             MR. SEVART:  No, Your Honor.

11:38:06  18             THE COURT:  On some of these motions I rule from

11:38:09  19   the bench.  That's obviously not going to happen here.  I want

11:38:11  20   to go back and look at, primarily, Officer Henry's testimony

11:38:18  21   regarding this matter.  And I think I -- I'm, I think, a

11:38:23  22   terrible poker player.  I think you all know exactly what my

11:38:27  23   thoughts are and where my issues are on these cases.  I'll look

11:38:31  24   at that and issue an order as quickly as possible.  That'll

11:38:33  25   conclude our hearing.  The Court's in recess.

11:38:35    1                    (Whereupon, the proceedings were concluded at

11:38:36    2              11:38 A.M.)

            3

            4

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

C E R T I F I C A T E

I, Johanna L. Wilkinson, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my hand on this the 4th day of April, 2017.


s/ Johanna L. Wilkinson
Johanna L. Wilkinson, CSR, CRR, RMR
United States Court Reporter